**Joanne BETTS and June Gagnier, on their own behalf and on behalf of their minor children,**

**v.**

**Caspar WEINBERGER, Individually and in his capacity as Secretary of the United States Department of Health, Education and Welfare and Paul Philbrook, Individually and in his capacity as Commissioner of the Vermont State Department of Social Welfare.**

**Civ. A. No. 73–182.**

United States District Court,
D. Vermont.

March 24, 1975.

Stephen W. Kimbell, Vt. Legal Aid, Inc., Burlington, Vt., for plaintiffs.

Jerome F. O'Neill, Asst. U. S. Atty., Rutland, Vt., for defendant Weinberger.

Robert L. Orleck, Asst. Atty. Gen., Montpelier, Vt., for defendant Philbrook.

Before WATERMAN, Circuit Judge, and HOLDEN and COFFRIN, District Judges.

COFFRIN, District Judge.

Plaintiffs in this action seek declaratory and injunctive relief from certain federal laws and federal and state regulations which they allege are being applied by the defendants in a way that deprives plaintiffs of entitlements secured to them by the Aid to Families with Dependent Children (AFDC) provisions of the Social Security Act. 42 U.S.C. § 601 et seq. Plaintiffs held public service employment (PSE) jobs under the Work Incentive Program (WIN). 42 U.S.C. § 630 et seq. Plaintiffs contend that defendants' failure to exempt their PSE earnings from consideration as income for purposes of determining welfare eligibility resulted in the termination of plaintiffs' welfare grants and Medicaid benefits.

*Statutory Background*

AFDC benefits are payments made to eligible families by the State of Vermont through its Aid to Needy Families with Children (ANFC) program pursuant to federal statutes. In recent years Congress has determined that recipients of AFDC benefits should be given the opportunity, through a program of job training and work experience, to become financially self-sufficient. As a condition for eligibility for an AFDC program such as ANFC, adult members of households receiving ANFC, with certain exceptions, must register for the WIN program and participate in it. 42 U.S.C. § 602(a)(19)(A).

The 1968 amendments to the Social Security Act included provisions consti-

tuting the WIN program for AFDC recipients. WIN was enacted as an Act of Jan. 2, 1968, Pub.L. 90–248, Title II, § 204(a), 81 Stat. 821, and became Part C of Title IV of the Social Security Act. The purpose of the WIN program was to endeavor to move welfare recipients to positions of employment in the economy and thus to restore them and their families to financial independence. These WIN programs were of three types:

(b) Such programs shall include, but shall not be limited to, (1)(A) a program placing as many individuals as is possible in employment, and (B) utilizing on-the-job training positions for others, (2) a program of institutional and work experience training for those individuals for whom such training is likely to lead to regular employment, and (3) a program of special work projects for individuals for whom a job in the regular economy cannot be found.

42 U.S.C. § 632(b) (1969), as amended, 42 U.S.C. § 632(b) (1974).

In 1967 Congress also created an incentive system so that welfare recipients could retain a portion of their earnings without being subjected to a 100 percent tax on their welfare grant. Act of Jan. 2, 1968, Pub.L. 90–248, Title II, §§ 202(b), 204(b), 81 Stat. 821. Under AFDC, each state determines its own standard of need—the income level below which one may qualify for state welfare. However, 42 U.S.C. § 602(a)(7) provided that the state must take into account any non-welfare income or resources of the family in determining whether a claimant is entitled to welfare benefits. Congress was concerned, however, that this provision would serve to discourage individuals on welfare from trying to find profitable employment. Consequently, 42 U.S.C. § 602(a)(8)(A)(ii) was added.[1] This section es-

---

1. 42 U.S.C. § 602(a)(8) provides in part as follows:

(a) A State plan for aid and services to needy families with children must * * * (8) provide that, in making

the determination under clause (7), the State agency—

(A) shall with respect to any month disregard—

tablished an "exemption" or "disregard" of $30 plus one-third of the remainder of the recipient's gross income. The exemption was designed to encourage recipients to work by enabling them to keep a portion of their earnings in addition to their welfare grants. This disregard provision did not apply to income derived from participation in the third WIN program described above, special work projects. Instead of the partial disregard provision found in 42 U.S.C. § 602(a)(8)(A)(ii), prior to 1971 the *entire* amount of income earned by a participant in the third WIN program was disregarded. 42 U.S.C. § 602(a)(19)(D).[2] Such provision did not, however, operate to give a welfare recipient the entire amount of the welfare payment for which he was eligible in addition to his earnings since the bulk of the grant to which the recipient was otherwise entitled was paid over to the federal government to defray the cost of the special work projects program. Only a lesser incentive amount went directly to the participant from the state. 42 U.S.C. § 602(a)(19)(E) (1969), repealed, Act of Dec. 28, 1971, Pub.L. No. 92–223, § 3(a)(5), 85 Stat. 802.[3]

In 1971 amendments to the WIN program abandoned special work projects in favor of a new program called public service employment (PSE). Act of Dec. 28, 1971, Pub.L. No. 92–223, § 3, 85 Stat.

---

(i) all of the earned income of each dependent child receiving aid to families with dependent children who is (as determined by the State in accordance with standards prescribed by the Secretary) a full-time student or part-time student who is not a full-time employee attending a school, college, or university, or a course of vocational or technical training designed to fit him for gainful employment, and

(ii) in the case of earned income of a dependent child not included under clause (i), a relative receiving such aid, and any other individual (living in the same home as such relative and child) whose needs are taken into account in making such determination, the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month (except that the provisions of this clause (ii) shall not apply to earned income derived from participation on a project maintained under the programs established by section 632(b)(2) and (3) of this title) ; and

2. 42 U.S.C. § 602(a)(19)(D) provides as follows :

(a) A State plan for aid and services to needy families with children must * * * (19) provide—* * *

(D) that (i) training incentives authorized under section 634 of this title, and income derived from a special work project under the program established by section 632(b)(3) of this title shall be disregarded in determining the needs of an individual under section 602(a)(7) of this title, and (ii) in determining such individual's needs the additional expenses attribut-

able to his participation in a program established by section 632(b)(2) or (3) of this title shall be taken into account ;

3. 42 U.S.C. § 602(a)(19)(E) (repealed) provided as follows :

(a) A State plan for aid and services to needy families with children must * * * (19) provide—* * *

(E) that, with respect to any individual referred pursuant to subparagraph (A) who is participating in a special work project under the program established by section 632(b)(3) of this title, (i) the State agency, after proper notification by the Secretary of Labor, will pay to such Secretary (at such times and in such manner as the Secretary of Health, Education, and Welfare prescribes) the money payments such State would otherwise make to or on behalf of such individual (including such money payments with respect to such individual's family), or 80 per centum of such individual's earnings under such program, whichever is lesser and (ii) the State agency will supplement any earnings received by such individual by payments to such individual (which payments shall be considered aid under the plan) to the extent that such payments when added to the individual's earnings from his participation in such special work project will be equal to the amount of the aid that would have been payable by the State agency with respect to such individual's family had he not participated in such special work project, plus 20 per centum of such individual's earnings from such special work project ; and

802.[4] This lawsuit arises from a dispute as to the effect of the 1971 amendments on existing income disregard provisions.

### Factual Background

Plaintiff Joanne Betts lives in Brattleboro, Vermont, with her two minor children. From January, 1971, until May 15, 1973, plaintiff Betts and her children received ANFC and Medicaid benefits from the Vermont Department of Social Welfare. In April, 1973, plaintiff, who was then receiving $192 per month from the Department of Social Welfare and $87 per month from her children's father as child support, accepted employment under the WIN program in the local sheriff's office. She obtained this job through the PSE program and received $301 per month, which, after mandatory deductions unrelated to the WIN program, resulted in a net monthly income of $274. On April 23, 1973, the Vermont Department of Social Welfare notified plaintiff Betts that her ANFC and Medicaid eligibility were being terminated effective May 15, 1973, because her income exceeded her needs based upon the ANFC standards of the Department of Social Welfare. This termination resulted from the application to the plaintiff by the Department of a federal statute and implementing regulations, respectively 42 U. S.C. § 602(a)(8)(A)(ii) and 45 C.F.R. § 233.20(a)(11)(iv). These provisions deny the so-called $30 and one-third income disregard to income from PSE jobs under the WIN program.

Plaintiff June Gagnier lives in Bristol with her son, age four. In February, 1973, she was receiving ANFC and Medicaid benefits from the Vermont Department of Social Welfare. In February, 1973, plaintiff Gagnier, who was then receiving $245 per month in ANFC benefits, accepted WIN employment in a dental clinic. This job paid her $390 per month which, after mandatory deductions unrelated to the WIN program, gave her net monthly earnings of $320 per month. In April, 1973, plaintiff's job was classified as public service employment, and the Department of Social Welfare accordingly determined that plaintiff's net monthly income exceeded the level of payment authorized by the ANFC program and discontinued ANFC and Medicaid eligibility effective May 15, 1973. The termination of benefits was for the same reason that plaintiff Betts' benefits were terminated.

When this case was argued on March 29, 1974, both Betts and Gagnier continued to hold their jobs at the sheriff's office and dental clinic respectively. However, both ceased to be employed through PSE in October, 1973. As of March, 1974, plaintiff Betts was receiving gross pay of $430 per month, or $361 per month net pay after mandatory deductions unrelated to WIN. Plaintiff Gagnier was receiving gross pay of $455

4. The change to public service employment from special work projects was accomplished mechanically in relevant part as follows:

(1) 42 U.S.C. § 632(b)(3) was amended by striking out "special work projects" and inserting in lieu thereof "public service employment."

(2) 42 U.S.C. § 633(e)(1) was amended by striking out "special work projects" and inserting in lieu thereof "public service employment."

(3) 42 U.S.C. § 633(e)(2)(A) was amended to read as follows:

(A) for the payment by the Secretary [of Labor] to each employer, with respect to public service employment performed by any individual for such employer, of an amount not exceeding 100 percent of the cost of providing such employment to such individual during the first year of such employment, an amount not exceeding 75 percent of the cost of providing such employment to such individual during the second year of such employment, and an amount not exceeding 50 percent of the cost of providing such employment to such individual during the third year of such employment;

(4) 42 U.S.C. § 633(e)(2)(B) was amended by striking out "on special work projects of" and inserting in lieu thereof "in public service employment for."

(5) 42 U.S.C. § 633(e)(3) was repealed.

(6) 42 U.S.C. § 633(h) was amended by striking out "special work projects" and inserting in lieu thereof "public service employment."

per month, or $370 net pay after deductions.

### Plaintiffs' Causes of Action

Plaintiffs allege three alternative causes of action. First, they claim that 42 U.S.C. § 602(a)(19)(D) exempts all PSE earnings from consideration as income in determining welfare eligibility. Plaintiffs allege that defendants are depriving them of entitlements due them under the Social Security Act by including their PSE earnings when determining plaintiffs' needs, resulting in the termination of plaintiffs' cash grants and Medicaid benefits. Plaintiffs argue that the Vermont regulation, Vermont Welfare Manual § 2256(4), and the federal regulation, 45 C.F.R. § 233.20(a)(11)(iv), must be struck down as violative of the supremacy clause of the United States Constitution insofar as they fail to provide a complete disregard of PSE income in determining welfare eligibility and benefits.

Plaintiffs' second contention is that even if their PSE income was properly considered in determining their need, they are still eligible for public assistance programs, whether or not they actually receive cash grants, and are thus entitled to continuation of their Medicaid benefits. They claim that 42 U.S.C. § 602(a)(19)(B) guarantees their right to continued Medicaid benefits, and that Vermont's denial of such benefits is also a violation of the supremacy clause.

The third claim alleges that the provisions of the Social Security Act that permit defendants to consider plaintiffs' PSE income in determining their eligibility for cash grants and Medicaid benefits violate plaintiffs' rights to due process and equal protection under the fifth and fourteenth amendments to the United States Constitution.

Because plaintiffs claim that the Vermont regulations and federal regulations and statute violate the fifth and fourteenth amendments to the Constitution and seek to enjoin compliance therewith, a three-judge court was convened pursuant to 28 U.S.C. § 2281 et seq.

I

Plaintiffs rely most heavily on their claim that 42 U.S.C. § 602(a)(19)(D) mandates a complete disregard of PSE income in determining welfare entitlements. In considering this claim we have found it necesary to make an investigation of the third component of the WIN program, initially known as "special work projects" but later described as "public service employment" by the 1971 amendments.

At all times, 42 U.S.C. § 602(a)(19)(D) has provided for a total disregard of all income from a special work project under the WIN program. Before its repeal in 1971, 42 U.S.C. § 602(a)(19)(E) (1969), repealed, Act of Dec. 28, 1971, Pub.L. 92–223, § 3(a)(5), 85 Stat. 802, mitigated the effect of this disregard provision. Subsection E required the state agency to pay a portion of the welfare grant to which a recipient would otherwise be entitled to the federal government instead of to the individual. The federal government in turn established accounts where these funds were collected. They were then used to pay a portion of the wages which the welfare recipients earned in the special work projects program. 42 U.S.C. § 633(e) (1969) as amended, 42 U.S.C. § 633(e) (1974). The state welfare department was not out of the picture entirely, however, since in order to provide an incentive for each recipient to participate in WIN, the state was to supplement a participant's private earnings under certain circumstances. Subsection E made the state responsible for a supplement in an amount equal to the difference between a participant's actual earnings and the welfare grant to which he would otherwise be entitled, plus twenty percent of those earnings. For example, suppose an individual earned $150 per month on his special work project, but would have been entitled to $200 per month on welfare. If his earnings were counted in determining his need, he would be entitled to a grant of only $50 per month. If this were the case, he would have no finan-

cial incentive to work because he would be entitled to the same amount for doing nothing. Subsection D provided that this $150 per month should not be counted in determining need. However, subsection D standing alone would give the recipient the benefit of his earnings and in addition a $200 per month welfare grant. To moderate the effect of subsection D, Congress included subsection E to reroute this windfall welfare grant to the federal government to help defray the cost of reimbursing the participant's employer. But subsection E did not reroute the entire amount. Had it done so, there would again be no financial incentive for the individual to participate in WIN. Accordingly, subsection E provided for a supplement to the participant from the state welfare department amounting to the difference between the actual wages earned ($150) and the sum of the grant to which the participant would otherwise be entitled ($200, creating a difference of $50), plus 20 percent of his monthly wages ($30, making a total state obligation of $80). Thus participation in a WIN special work project would mean an increase of $30 per month over welfare benefits to our hypothetical participant. The mathematics of this provision were such that as a participant began to earn more, the state welfare department's supplementary payments eventually would be eliminated. The state would not be responsible for any supplementary grant when the participant in our hypothetical situation earned a monthly income of $250 or more, since that figure is an amount equal to the $200 welfare benefit to which the participant would otherwise be entitled plus 20 percent of his earnings.

This incentive arrangement was changed in 1971. The moving force behind the 1971 amendments to the WIN program was Senator Talmadge of Georgia. The Senator was concerned with what he termed "welfare expansion" without meaningful reform. The primary concern was that WIN classroom training did not lead to jobs for the trainees. The amendment he introduced proposed to require registration for WIN of almost all welfare recipients, to provide more on-the-job training and public employment, to provide tax incentives to private employers, to simplify the financing provisions, and to rationalize the program's administration.[5]

For our purposes, the most significant amendment to the WIN program was the deletion of subsection E. Part of subsection E was rendered obsolete in any event by the new funding provisions which no longer contemplated state participation after the special accounts for deposit of subsection E funds were eliminated. 42 U.S.C. § 633(e)(3), repealed, Act of Dec. 28, 1971, Pub.L. 92–223, § 3(b)(4)(C)(iv), 85 Stat. 802. But part of subsection E was important in controlling benefits paid to WIN participants. It was subsection E that prevented a participant from reaping a double harvest of wage earnings plus a full welfare grant. Subsection E also directed the state welfare department to pay a work incentive supplement to WIN participants. Without subsection E, the disregard provisions of 42 U.S.C. § 602(a)(19)(D) operate without any restraint. And if the disregard provisions apply with full force to income earned through a PSE program, then a participant in the program will indeed reap a

5. See 117 Cong.Rec. 4379–4380 (1971) (remarks of Senator Talmadge). The bill that became Public Law 92–223 was a House bill, H.R. 10604. It was Senator Talmadge, however, who proposed the amendments to the WIN program when H.R. 10604 came to the Senate. 117 Cong.Rec. 44717 (1971). Senator Talmadge had previously introduced a Senate bill, S. 1019, on March 1, 1971, which contained the same provisions as his amendment to H.R. 10604. 117 Cong.Rec. 4380 (1971). Concern over the WIN program was shared by members of the House of Representatives who had also looked into possible modifications to WIN in connection with H.R. 1. See 117 Cong.Rec. 21090–21091 (1971) (remarks of Congressman Mills).

double benefit. Such a scheme hardly comports with Congress' dismay at rising welfare costs. Even though a work incentive program implies some "incentive," a total disregard of PSE income lavishes a far more substantial reward upon the participants in this division of the WIN program than is available to participants in any other part, far more substantial than the financial inducements offered through the special work projects program prior to 1971. Taking these facts into account, defendant Weinberger argues that if Congress had intended subsection 602(a)(19)(D) to apply to public service employment, it would not have left the words "special work project" in the subsection without adding or substituting "public service employment" at a time when it was paying such close attention to 42 U.S.C. § 602(a)(19). Defendant Weinberger also points out that public service employment was not merely another name for special work projects, but was rather an entirely different program.

We agree with defendant Weinberger and reject plaintiffs' claims as unreasonable, basing our holding on what we conceive to be the reasonable interpretation of the statute and the one which gives the language of the statute the effect most likely to conform to the intent of Congress as expressed in the legislative history. *See* Rosado v. Wyman, 397 U.S. 397, 415, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969). The statute on its face does not mandate a disregard of income earned from public service employment, and we decline to read such a disregard into the statute. Nor do we believe that Congress intended to allow PSE partici-

pants to reap the windfall of retaining both their AFDC grants and their PSE income at a time of great concern over rising welfare costs and recipients who receive grants despite high family incomes through the use of disregards and deductions. This interpretation is in harmony with the 1971 substitution by Congress of public service employment for special work projects as the third element of the WIN program and is consistent with the original operation and effect of 42 U.S.C. § 602(a)(19)(D) as limited by former subsection E. Accordingly we reject plaintiffs' contentions that 42 U.S.C. § 602(a)(19)(D) requires Vermont to disregard their PSE income in determining their eligibility for AFDC grants and that 45 C.F.R. § 233.20(a)(11)(iv) and Vermont Welfare Manual § 2256(4) are in conflict with the statute and must be struck down.[5a]

## II

Plaintiffs' second allegation is that 42 U.S.C. § 602(a)(19)(B)[6] prohibits the termination of their Medicaid benefits and that Vermont's denial of those benefits violates the supremacy clause of the Constitution.

Subchapter XIX of Title 42, 42 U.S.C. § 1396 et seq., provides for grants to states for medical assistance programs for various recipients of categorical assistance including families with dependent children. The State of Vermont has also established a program allowing "medically needy" persons to receive Medicaid benefits. *See* Vermont Welfare Manual § 2420. Plaintiffs, however, have made no claim that they are

---

[5a]. The approach we take has led another United States District Court to the same conclusion we reach here. See, Linkenhoker v. Weinberger, 387 F.Supp. 449 (D.Md. 1975). The reasoning in *Linkenhoker* is also applicable to the other claims which plaintiffs advance and which are hereinafter discussed.

[6]. 42 U.S.C. § 602(a)(19)(B) provides as follows:

(a) A State plan for aid and services to needy families with children must * * *
(19) provide—* * *

(B) that aid under the plan will not be denied by reason of such registration or the individual's certification to the Secretary of Labor under subparagraph (G) of this paragraph, or by reason of an individual's participation on a project under the program established by section 632(b)(2) or (3) of this title;

eligible for benefits because they are medically needy.

■ Plaintiffs' contention is that they should not have been denied Medicaid benefits because 42 U.S.C. § 602(a)(19)(B) provides that aid will not be denied by reason of an individual's participation on a project under the program established by 42 U.S.C. § 632(b)(3), which of course refers to public service employment. The word "aid" as used in 42 U.S.C. § 602(a)(19)(B), however, does not apply solely to Medicaid benefits, but to AFDC benefits generally. If plaintiffs' argument is correct, this subsection would mandate the payment of cash grants as well as Medicaid payments.

■ Defendants contend that 42 U.S.C. § 602(a)(19)(B) is designed to prevent the denial of AFDC benefits solely because of participation in a PSE program. For an example, they point to recipients under the AFDC–Unemployed Father program established by 42 U.S.C. § 607. Regulations pursuant to that section require a state to include in its definition of an unemployed father any father who is employed less than 100 hours a month. 45 C.F.R. § 233.-100(a)(1)(i). Defendants contend that this provision is evidence that 42 U.S.C. § 602(a)(19)(B) and the parallel regulation, 45 C.F.R. § 233.11(e), are designed to preclude the denial of benefits to unemployed fathers whose work under a PSE program might be in excess of 100 hours a month but whose income did not exceed the allowable limit for AFDC benefits.

Defendant Philbrook contends that plaintiffs were denied Medicaid benefits not because of their participation in a PSE program, but because their income exceeded their need, making them ineligible for such benefits.[7] We agree and reject plaintiffs' contention that 42 U.S.C. § 602(a)(19)(B) prevents a state from cutting off Medicaid benefits to participants in a PSE program without regard to their income.

### III

Plaintiffs' final contention is that consideration of all of their PSE earnings for purposes of eligibility for cash grants and/or Medicaid benefits violates their rights to due process and equal protection under the fifth and fourteenth amendments.[8] They contend that since other participants in WIN programs have a portion of their incomes disregarded for purposes of determining their eligibility for cash grants, the classification that distinguishes PSE participants from other WIN participants is violative of plaintiffs' equal protection rights.

■ The standard analysis of equal protection claims involves a so-called "two-tier" system. When a fundamental right or a suspect classification is involved, the state must demonstrate a compelling state interest to justify the classification.[9] The traditional guideline in the absence of a fundamental

---

7. According to plaintiffs, plaintiff Betts' need is $333 per month, of which Vermont would pay 90 percent, or $300. Her gross income from her job is $430 per month, and her net income is $361. Even without the child support payments she receives, her income is above her need. Similarly, plaintiff Gagnier's need is $273 per month, of which Vermont would pay 90 percent, or $246. Her gross income is $455 and her net $370 per month. (Plaintiffs' reply memorandum at 9–10). Thus, both plaintiffs have incomes well above their need standard.

8. "[W]hile the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is 'so unjustifiable as to be violative of due process.'" Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964); see United States Department of Agriculture v. Moreno, 413 U.S. 528, 533 n. 5, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); Frontiero v. Richardson, 411 U.S. 677, 680 n. 5, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). Although the following discussion will speak in terms of states, the principles are equally applicable to the federal government.

9. E. g., Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (voting); Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (race).

right or suspect classification has been that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." [10] This standard of minimal scrutiny is usually applied in the social welfare and economic area.

While there has been a good deal of dissatisfaction expressed with regard to the two-tier analysis of equal protection claims,[11] and a middle ground between the "strict" and "minimal" scrutiny approaches has been recognized, at least to some extent, in the cases,[12] a majority of the Supreme Court has never explicitly approved a deviation from the traditional analysis. Thus, we will continue to follow the Court's holding in Dandridge v. Williams, 397 U.S. 471, 90 S. Ct. 1153, 25 L.Ed.2d 491 (1970).

In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78 [31 S. Ct. 337, 55 L.Ed. 369]. "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70 [33 S.Ct. 441, 57 L.Ed. 730]. "A statutory discrimi-

nation will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426 [81 S.Ct. 1101, 6 L.Ed.2d 393].

397 U.S. at 485, 90 S.Ct. at 1161.

■ We believe that there is a reasonable basis for the absence of an income disregard for PSE participants and decline to overturn the statutory scheme on equal protection or due process grounds. 42 U.S.C. § 632(b) sets up three classifications that WIN programs must include, although it allows for others.[13] Subsection (1) provides for jobs in regular employment situations while subsections (2) and (3) provide for federally funded vocational training and public service employment programs. The goal of the program is to place as many individuals in the regular economy as possible. 42 U.S.C. § 632(b)(1)(A). Public service employment jobs are looked on as temporary, and the Secretary must review the employment records of each individual participant at least once every six months to determine if the individual can be shifted to regular employment or other programs. 42 U.S.C. § 633(h). The fact that a recipient employed in the private sector would receive a disregard of $30 plus one-third of his monthly income in determining welfare eligibility would tend to encourage PSE participants to move to private employment in order to take advantage of this provision. The incentive would disappear if a similar or more attractive work incen-

---

10. McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

11. E. g., Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972).

12. E. g., San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 70, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973) (Justice Marshall, dissenting) ; Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir. 1973), reversed, 416 U.S. 1, 94 S.Ct. 1536, 39 L. Ed.2d 797 (1974).

13. 42 U.S.C. § 632(b) reads as follows:
(b) Such programs shall include, but shall not be limited to, (1)(A) a program placing as many individuals as is possible in employment, and (B) a program utilizing on-the-job training positions for others, (2) a program of institutional and work experience training for those individuals for whom such training is likely to lead to regular employment, and (3) a program of public service employment for individuals for whom a job in the regular economy cannot be found.

tive obtained under PSE programs. Moving individuals into the private sector of the economy is certainly an eminently reasonable purpose. A further rational basis exists. To give PSE participants an income disregard would be to add to the amount of federal funds they receive since both the vocational training programs and public service employment positions are federally funded, as are AFDC grants. Those working at jobs in the regular economy, on the other hand, are getting an additional sum not from the federal government, but from private sector employers. In view of the legislative history of the 1971 WIN amendments which shows that Congress was apprehensive over rising welfare costs, elimination of any income disregard for PSE participants certainly can be seen as an economy in harmony with legislative concerns.

In addition, we believe that the Supreme Court has clearly stated that the judgments of Congress and the state legislatures are to be given deference in the area of social welfare legislation. Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971); Dandridge v. Williams, *supra*. Thus, we hold that the failure of Congress to provide PSE participants with an income disregard does not violate the commands of due process or equal protection of the law.

## IV

■ Defendant Philbrook has raised the question of mootness because neither plaintiff is presently employed under a public service employment contract. According to defendant Philbrook, the expiration of the PSE contracts has mooted the controversy and this court should dismiss the case. We decline to do so because the claim is based upon a governmental policy which is "capable of repetition, yet evading review." South-

ern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Because of Congress' command to the Secretary to review the employment records of all PSE participants at least every six months, 42 U.S.C. § 633(h), and because of the transitory nature of PSE contracts in general, it appears that the average duration of PSE jobs is likely to be rather short. Plaintiffs' experience illustrates the abbreviated nature of the program since their contracts were terminated six months after they began. Because of the shortness of these periods when compared to the time it often takes courts to reach decisions (the instant case being an example) and the possibility that a former PSE participant may well be back in a PSE program at a later time given the present condition of the economy, we hold that the factual situations giving rise to the plaintiffs' original claims are certainly "capable of repetition, yet evading review" within the meaning of *Southern Pacific*.

The United States Supreme Court has recently reiterated its approval of the principles enunciated in *Southern Pacific*. See, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974). In *Roe* the Court determined the merits of the plaintiff's challenge to a state's anti-abortion statute despite the fact that the record failed to disclose whether or not the plaintiff was pregnant at the time of the district court hearing and despite the fact that she was not pregnant at the time of the Supreme Court's review. Because "the normal 266-day human gestation period is so short that the pregnancy will come to term before the usual appellate process is complete," the Court acknowledged it was confronted with an exception to the principle that "an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is

initiated." 410 U.S. at 125, 93 S.Ct. at 712. Citing *Southern Pacific,* the Court concluded that "[p]regnancy provides a classic justification for a conclusion of nonmootness. It truly could be 'capable of petition, yet evading review.'" *Id.* Similarly, in the *Super Tire* case the Court determined that a suit in which the plaintiffs attacked the state's policy of paying welfare benefits to strikers did not become moot when the strike terminated. The Court said that while "the case for an injunction dissolved with the subsequent settlement of the strike . . . the parties to the principal controversy . . . may still retain sufficient interests and injury as to justify the award of declaratory relief." 416 U.S. at 121–22, 94 S.Ct. at 1698. The Court pointed out that the challenged governmental policy was fixed and definite and that most labor strikes are of relatively short duration. What is important, in the eyes of the Court is "the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *Id.* at 125–26, 94 S.Ct. at 1700. We are satisfied that the interpretation of the statute in question here affects the present interests of the plaintiffs and others who may be similarly situated, and consequently the criteria established by the Supreme Court in *Southern Pacific,* as interpreted in Roe v. Wade and *Super Tire* are met. By this opinion, however, we do not mean to weaken any of the general principles pertaining to the determination of mootness. The Court supports the general proposition that a plaintiff who is not a participant in a particular welfare or social security program should not be allowed to challenge the administrative features of such a program.

Accordingly, plaintiffs' application for relief is denied and judgment will be entered for the defendants.