*296 Mr. Justice Douglas
delivered the opinion of the Court.
The Immigration and Nationality Act of 1952, 66 Stat. 163, 269, 8 U. S. C. §§ 1101, 1484, provides by § 352:
“(a) A person who has become a national by naturalization shall lose his nationality by—
“(1) having a continuous residence for three years in the territory of a foreign state of which he was formerly a national or in which the place of his birth is situated, except as provided in section 353 of this title,[1] whether such residence commenced before or after the effective date of this Act . . . .” (Italics added.)
Appellant, a German national by birth, came to this country with her parents when a small child, acquired derivative American citizenship at the age of 16 through her mother, and, after graduating from Smith College, went abroad for postgraduate work. In 1956 while in France she became engaged to a German national, returned here briefly, and departed for Germany, where she married and where she has resided ever since. Since her marriage .she has returned to this country on two occasions for visits. Her husband is a lawyer in Cologne where appellant has been living. Two of her four sons, born in Germany, are dual nationals, having acquired American citizenship under § 301 (a) (7) of the 1952 Act. The American citizenship of the other two turns on this case. In 1959 the United States denied her a passport, the State Department certifying that she had lost her American citizenship under § 352 (a)(1), quoted above. Appellant sued for a declaratory judgment that she still is an American citizen. The District Court held against her, 218 F. *297 Supp. 302, and the case is here on appeal.[2] 375. U. S. 893.
The Solicitor General makes his case along the following lines.
Over a period of many years this Government has been seriously concerned by special problems engendered when naturalized citizens return for a long period to the countries of their former nationalities. It is upon this premise that the argument derives that Congress, through its power over foreign relations, has the power to deprive such citizens of their citizenship.
Other nations, it is said, frequently attempt to treat such persons as their own citizens, thus embroiling the United States in conflicts when it attempts to afford them protection. It is argued that expatriation is an alternative to withdrawal of diplomatic protection. It is also argued that Congress reasonably can protect against the tendency of three years’ residence in a naturalized citizen’s former homeland to weaken his or her allegiance to this country. The argument continues that it is not invidious discrimination for Congress to treat such naturalized citizens differently from the manner in which it treats native-born citizens and that Congress has the right to legislate with respect to the general class without regard to each factual violation. It is finally argued that Congress here, unlike the situation in Kennedy v. Mendoza-Martinez, 372 U. S. 144, was aiming only to regulate and not .to punish, and that what Congress did had been deemed appropriate not only by this country but by many others and is in keeping with traditional American concepts of citizenship.
We start from the premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive. The only difference drawn by the Constitution is that only the “natural born” citizen is eligible to be President. Art. II, § 1.
*298 While the rights of citizenship of the native born derive from § 1 of the Fourteenth Amendment and the rights of the naturalized citizen derive from satisfying, free of fraud, the requirements set by Congress, the latter, apart from the exception noted, “becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the constitution, on the footing of a native. The constitution does not authorize Congress to enlarge or abridge those rights. The simple power of the national Legislature, is to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual.” Osborn v. Bank of United States, 9 Wheat. 738, 827. And see Luria v. United States, 231 U. S. 9, 22; United States v. MacIntosh, 283 U. S. 605, 624; Knauer v. United States, 328 U. S. 654, 658.
Views of the Justices have varied when it comes to the problem of expatriation.
There is one view that the power of Congress to take away citizenship for activities of the citizen is nonexistent absent expatriation by the voluntary renunciation of nationality and allegiance. See Perez v. Brownell, 356 U. S. 44, 79 (dissenting opinion of Justices Black and Douglas) ; Trop v. Dulles, 356 U. S. 86 (opinion by Chief Justice Warren). That view has not yet commanded a majority of the entire Court. Hence we are faced with the issue presented and decided in Perez v. Brownell, supra, i. e., whether the present Act violates due process. That in turn comes to the question put in the following words in Perez:
“Is the means, withdrawal of citizenship, reasonably calculated to effect the end that is within the power of Congress to achieve, the avoidance of embarrassment in the conduct of our foreign relations . . . ?” 356 U. S., at 60.
*299 In that case, where an American citizen voted in a foreign election, the answer was in the affirmative. In the present case the question is whether the same answer should be given merely because the naturalized citizen lived in her former homeland continuously for three years. We think not.
Speaking of the provision in the Nationality Act of 1940, which was the predecessor of § 352 (a)(1), Chairman Dickstein of the House said that the bill would “relieve this country of the responsibility of those who reside in foreign lands and only claim citizenship when it serves their purpose.” 86 Cong. Rec. 11944. And the Senate Report on the 1940 bill stated:
“These provisions for loss of nationality by residence abroad would greatly lessen the task of the United States in protecting through the Department of State nominal citizens of this country who are abroad but whose real interests, as shown by the conditions of their foreign stay, are not in this country.” S. Rep. No. 2150, 76th Cong., 3d Sess., p. 4.
As stated by Judge Fahy, dissenting below, such legislation, touching as it does on the “most precious right” of citizenship (Kennedy v. Mendoza-Martinez, 372 U. S., at 159), would have to be justified under the foreign relations power “by some more urgent public necessity than substituting administrative convenience for the individual right of which the citizen is deprived.” 218 F. Supp. 302, 320.
In Kennedy v. Mendoza-Martinez, supra, a divided Court held that it was beyond the power of Congress to deprive an American of his citizenship automatically and without any prior judicial or administrative proceedings because he left the United States in time of war to evade or avoid training or service in the Armed Forces. The Court held that it was an unconstitutional use of *300 congressional power because it took away citizenship as punishment for the offense of remaining outside the country to avoid military service, without, at the same time, affording him the procedural safeguards granted by the Fifth and Sixth Amendments. Yet even the dissenters, who felt that flight or absence to evade the duty of helping to defend the country in time of war amounted to manifest nonallegiance, made a reservation. Justice Stewart stated:
“Previous decisions have suggested that congressional exercise of the power to expatriate may be subject to a further constitutional restriction — a limitation upon the kind of activity which may be made the basis of denationalization. Withdrawal of citizenship is a drastic measure. Moreover, the power to expatriate endows government with authority to define and to limit the society which it represents and to which it is responsible.
“This Court has never held that Congress’ power to expatriate may be used unsparingly in every area in which it has general power to act. Our previous decisions upholding involuntary denationalization all involved conduct inconsistent with undiluted allegiance to this country.” 372 U. S., at 214.
This statute proceeds on the impermissible assumption that naturalized citizens as a class are less reliable and bear less allegiance to this country than do the native born. This is an assumption that is impossible for us to make. Moreover, while the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is “so unjustifiable as to be violative of due process.” Bolling v. Sharpe, 347 U. S. 497, 499. A native-born citizen is free to reside abroad indefinitely without suffering loss of citizenship. The discrimination aimed at naturalized citizens drastically limits their rights to live *301 and work abroad in a way that other citizens may. It creates indeed a second-class citizenship. Living abroad, whether the citizen be naturalized or native born, is no badge of lack of allegiance and in no way evidences a voluntary renunciation of nationality and allegiance. It may indeed be compelled by family, business, or other legitimate reasons.

Reversed.

Mr. Justice Brennan took no part in the decision of this case.

The exceptions relate, inter alia, to residence abroad in the employment of the United States and are not relevant here.

 For other aspects of the ease see 372 U. S. 224.