**Jose Miguel RAMOS–HERNANDEZ, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 76–2403.**

United States Court of Appeals, Ninth Circuit.

Dec. 23, 1977.

Michael D. Finnegan, (argued), San Francisco, Cal., for petitioner.

Lauri S. Filppu, (argued), Washington, D. C., for respondent.

Before BARNES and TRASK, Circuit Judges, and BURNS,* District Judge.

BARNES, Senior Circuit Judge:

Petitioner Jose Miguel Ramos-Hernandez (Ramos), who seeks in this proceeding to avoid deportation, was born in Mexico in 1939. His mother is a native-born American citizen, his father a Mexican national. He therefore became an American citizen at birth under § 1993 of the Revised Statutes, as amended by the Act of May 24, 1934 (48 Stat. 797).[1]

---

\* Honorable James M. Burns, United States District Judge, District of Oregon, sitting by designation.

1. At the time of petitioner's birth § 1993 provided:

"Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend to any such child unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child. In cases where one of the parents is an alien, the right of citizenship shall not descend unless the child comes to the United States and resides therein for at least five years continuously

However, because only one of his parents is an American citizen, Ramos was required by statute to satisfy a residence requirement in order to retain his American citizenship. This requirement has been changed by Congress several times.[2] The current, 1972, version of the Immigration and Nationality Act requires *two* years residence in the United States between the ages of fourteen and twenty-eight.[3] Prior to the 1972 amendment the Act required *five* years of residence between the ages of fourteen and twenty-eight.[4]

Ramos came to the United States in 1972 or 1973 at the age of thirty-two or thirty-three. Although it is unclear whether the 1952 or 1972 provision is applicable to him, Ramos had no United States residence before age twenty-eight and thus admits he has not satisfied the residence requirement of either statute.

In 1974 the Immigration and Naturalization Service began deportation proceedings, claiming Ramos to be an alien who entered the United States illegally and who is therefore deportable pursuant to 8 U.S.C. § 1251(a)(2). While conceding that if he is determined to be an alien he is deportable under this statute, Ramos contends he is an American citizen and thus cannot be deported.

Ramos asserts that one who acquires American citizenship at birth under § 1993 cannot lose that citizenship due to failure to comply with the residence requirement

when noncompliance is the result of ignorance of that requirement.

Briefly, Ramos testified at his deportation hearing that he learned of his American citizenship while a boy in Mexico but because he was unaware of the residence requirement he did not come to the United States until the time for compliance had passed. The immigration judge, without deciding whether ignorance would excuse compliance, held that Ramos had not established his lack of knowledge. The Board of Immigration Appeals affirmed, agreeing with the immigration judge on the facts and further ruling that even if Ramos was unaware of the residence requirement his ignorance would not prevent operation of the statute against him.

Both parties place primary reliance on *Rogers v. Bellei*, 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971), which upheld the constitutionality of § 1401(b). *Bellei* is the most recent of several cases dealing with loss of citizenship.

In *Perez v. Brownell*, 356 U.S. 44, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958), the Supreme Court held that Congress could constitutionally decree loss of citizenship as a consequence of conduct voluntarily entered into (voting in a foreign political election). Less than a decade later, *Afroyim v. Rusk*, 387 U.S. 253, 87 S.Ct. 1660, 18 L.Ed.2d 757 (1967), overruled the holding in *Perez* that a citizen might lose his citizenship "regardless of his intention not to give it up." *Id.* at

immediately previous to his eighteenth birthday, and unless, within six months after the child's twenty-first birthday, he or she shall take an oath of allegiance to the United States of America as prescribed by the Bureau of Naturalization."

2. These changes are expressly made applicable to persons born abroad after May 24, 1934. 8 U.S.C. § 1401(c).

3. 8 U.S.C. § 1401(b) provides:
"Any person who is a national and citizen of the United States under paragraph (7) of subsection (a) of this section shall lose his nationality and citizenship unless—(1) he shall come to the United States and be continuously physically present therein for a pe-

riod of not less than two years between the ages of fourteen years and twenty-eight years . . ."

4. "Any person who is a national and citizen of the United States at birth under paragraph (7) of subsection (a) of this section, shall lose his nationality and citizenship unless he shall come to the United States prior to attaining the age of twenty-three years and shall immediately following any such coming be continuously physically present in the United States for at least five years: *Provided* that such physical presence follows the attainment of the age of fourteen years and precedes the age of twenty-eight years." Act of June 27, 1952, Ch. 1, § 301(b), 66 Stat. 235.

255, 87 S.Ct. at 1661. In striking down the statute upheld in *Perez*, the Court held that Congress has no power, absent the citizen's consent, to take away citizenship created by the first sentence of the Fourteenth Amendment.[5] "Rather the Amendment can most reasonably be read as defining a citizenship which a citizen keeps unless he voluntarily relinquishes it." *Afroyim v. Rusk, supra,* at 262, 87 S.Ct. at 1665.

In *Bellei* the Court refused to apply the voluntary relinquishment standard to citizenship not based on the Fourteenth Amendment. Rather, it held that since the citizenship of persons not "born or naturalized in the United States" as provided in the first sentence of the Fourteenth Amendment is created by statute and not by the Constitution, it is subject to appropriate Congressional regulation. Finding that the residence requirement of § 1401(b) was not "unreasonable", "arbitrary", *Rogers v. Bellei, supra* at 832, 91 S.Ct. at 1069, "irrational . . . or unfair," *id.* at 833, 91 S.Ct. 1060, the Court held § 1401(b) facially constitutional.

In language which suggests that there may be circumstances in which § 1401(b) is unconstitutional, the Court held that as applied to *Bellei* the statute was constitutional. In so doing it stated that:

> The plaintiff is not stateless. His Italian citizenship remains. He has lived practically all his life in Italy. He has never lived in this country; although he has visited here five times, the stipulated facts contain no indication that he will ever live here. *He asserts no claim of ignorance or of mistake or even of hardship. He was warned several times of the provision of the statute and of his need to take up residence in the United States prior to his 23d birthday.*
> *Id.* at 836, 91 S.Ct. at 1071. (Emphasis added.)

Ramos contends this passage precludes application of § 1401(b) to a citizen like himself who is unable to comply because of lack of knowledge of statutory requirements. He points out that, unlike himself, Bellei admittedly knew not only that he was an American citizen but also that his citizenship was subject to a residence requirement. Thus Bellei could not have asserted the defense raised here.

Voluntariness has two possible meanings. The first is objective voluntariness, that is the non-coerced performance of an act regardless of subjective intent. The second is subjective voluntariness; this requires an examination of the subjective intent of one who performs an act which is objectively voluntary.

Basing its decision on the first sentence of the Fourteenth Amendment, *Bellei* held that subjective voluntariness is not always a prerequisite to loss of citizenship. Rather, persons whose citizenship stems from birth abroad to one citizen and one non-citizen parent are not within the coverage of the Fourteenth Amendment's first sentence and therefore "voluntary relinquishment" of citizenship on their part is not required.

At the deportation hearing, appellant asserted his citizenship as a defense. He sought to excuse his noncompliance with the residency requirements of Section 1993 by asserting ignorance of them. Appellant, who was the sole witness at the hearing, testified that since the age of ten, he knew that because his mother was a native born citizen, he had a *right to* United States citizenship. R. at 54–55. He also stated that in 1957 his mother went with his eldest brother, Refugio, to the United States consulate in Juarez, Mexico, and they were allegedly informed by the consul that the three oldest children—Refugio, the appellant, and Gonzalo—had a right to United States citizenship.[6] However, he contended that the consul did not inform his mother nor did he himself ever become aware prior to his coming to this country, of the residency requirements in Section 1993.

---

**5.** "All persons born or naturalized in the United States . . . are citizens . . . ."

**6.** Appellant's mother and older brother, Refugio, were admitted into the United States in 1957.

In addition to the appellant's testimony, the transcript of the deportation hearing of appellant's brother, Gonzalo, was submitted as an exhibit.[7] The immigration judge before whom Gonzalo appeared was the same one who presided over appellant's hearing. The transcript of the former hearing contained the testimony of the appellant's mother, Refugio and his brother, Gonzalo. This testimony, although at times unclear and conflicting, generally supported the appellant's contentions.

By way of additional background, it is noted from the record that the appellant and his family are quite poor and have spent the majority of their lives in a small town in Mexico. Appellant was the second of twelve children and received only about one year of formal education. As demonstrated throughout the transcripts of both hearings, and, as admitted by the immigration judge, neither the appellant nor the other members of the family have indicated an awareness of "the niceties of acquisition of citizenship." See, e. g., R. at 166.

The immigration judge did not reach the underlying legal issue of the case but merely held that the appellant had failed to establish his ignorance of the residency requirements. He did not justify that holding on the basis of any positive proof of knowledge. Rather, he found the testimony of the appellant's mother and brothers in Gonzalo's deportation hearing to be unworthy of belief. From that conclusion, he found it unlikely that the United States consul had failed to inform the mother and Refugio of the proper law and the residency requirements. The immigration judge further stated that, because they were thus informed by the consul, it was unlikely that they would not have told the appellant of the requirements (the assumption here being that they would have correctly informed him of "the niceties of acquisition of citizenship"). The judge also failed to believe the appellant's testimony, citing certain inconsistencies in his testimony at the hearing and his prior statements before the designated naturalization examiner.[8] The Board of Immigration Appeals affirmed the immigration judge's finding that the appellant failed to carry his burden of showing his ignorance of the residency requirements. However, the Board also held that even if he was unaware of them, ignorance is no excuse and the failure to comply with the requirements by itself, is determinative.

The initial issue raised is whether ignorance of the residency requirements can excuse a failure to satisfy them so as to prevent the loss of citizenship pursuant to Section 301(b) of the Act. In *Rogers v. Bellei*, 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971), the Supreme Court found Section 301(b) to be constitutional. The challenger in that case, Bellei, had been warned about the statute at least twice by United States immigration officials and yet did not comply even though he had been in the country on five different occasions before the loss of his citizenship. In its opinion, the Court traced the legislative history of Section 301, noting that, prior to 1934, there was no provision by which a foreign born person, such as Bellei (or the appellant

---

7. Gonzalo, being born in June of 1941, did not acquire citizenship under Section 1993 or Section 301(a)(7). He entered the United States illegally in 1971. At his deportation hearing, his defense was that the United States consul in Juarez misinformed his mother in 1957 by stating that her three eldest children were United States citizens. Gonzalo asserted that because of that misinformation, he did not seek to come to the United States as an immigrant, as he was eligible to do at that time. Consequently, he argued that the government was estopped from denying him resident status.

The legal issues involved in the two hearings, Gonzalo's and the appellant's are different. However, certain of the same issues of fact are relevant to the outcome of both cases, e. g., what the United States consul actually said to the appellant's mother in 1957.

8. The immigration judge found it significant that the appellant had told the naturalization examiner that he first found that his mother was born in the United States when he was 17 or 18. At the deportation hearing, the appellant states that he was told about his mother's birth location at the age of 10. The importance of this difference is uncertain as it is not too central to the main issue of the appellant's case and as the latter testimony would, if anything, be more potentially damaging to his cause than the initial response.

here) could claim citizenship pursuant to his mother's status as a native born citizen. The Court found that Congress possessed the power to grant citizenship to the foreign born and at the same time to impose qualifications and conditions for that citizenship. A distinction was made between "Fourteenth Amendment-first-sentence citizens" (those born *in* or naturalized *in* the United States) and those whose citizenship was bestowed by the Congressional enactment of Section 301 and its predecessors. The former type of citizenship was held to be beyond the power of the government to destroy and could only be taken away with the individual's consent. *Bellei, supra*, 401 U.S. at 822 and 830, 91 S.Ct. 1060, *Afroyim v. Rusk*, 387 U.S. 253, 257, 87 S.Ct. 1660 (1967). It was held that, under prior law, the *second type of citizenship* could be conferred with conditions precedent without raising constitutional problems. Consequently, it was argued that Congress could likewise impose conditions subsequent to such citizenship without violating the Constitution.[9] The specific residency requirements were found to be a reasonable condition subsequent given the congressional concern over the problems of dual nationality and allegiance. *Bellei, supra* 401 U.S. at 830–33, 91 S.Ct. 1060.

After finding the condition subsequent and Section 301(b) to be facially constitutional, the Court further held that there was no constitutional infirmity in their application to Bellei. The Court found that Bellei had lived practically all his life in Italy, and the facts in the record gave no indication that he intended to live in this country. In addition it was noted that Bellei "asserts no claim of ignorance or of mistake or even of hardship. He was warned several times of the provision of the statute and of his need to take up residence

in the United States prior to his 23d birthday." *Bellei, supra*, 401 U.S. at 836, 91 S.Ct. at 1071.

The above quote from the *Bellei* case suggests that in the instant case there remains a question regarding the application of Section 301(b) to cases where the individual is ignorant, mistaken or somehow prevented from complying with the residency requirements. There is little case law on the issue. Prior decisions of the Board of Immigration Appeals have held that an individual who is unaware of his claim to United States citizenship does not lose that citizenship by virtue of Section 301(b) when his failure is due to ignorance of the claim or circumstances beyond his control. The language of two of those decisions is instructive. In *Matter of Yanez-Carillo*, 10 I. & N. Dec. 366, 369 (1963), the Board held that:

> Section 301(b) of the Immigration and Nationality Act is not a provision relating to expatriation but it does involve a forfeiture of a claim to United States citizenship upon failure to meet the prescribed conditions. In this respect it is similar to the provisions of section 401(a) of the Nationality Act of 1940 that a dual national return to the United States within the two-year statutory period or suffer the loss of citizenship, which has been construed not to run until the individual became aware of his claim to United States citizenship.[2] The Attorney

> [2] *Perri v. Dulles*, 206 F.2d 586, 591 (3d Cir. 1953); *Petition of Acchione*, 213 F.2d 845 (3d Cir. 1954)."[10]

General has endorsed the holding in those cases and it appears to be but a logical extension to hold that the forfeiture provisions of section 301(b) of the Immigration and Nationality Act requiring continuous physical presence in the United States between the ages of 14 and 28, do not operate to deprive an individual of

---

**9.** The *Bellei* opinion has generated a fair amount of critical commentary. *See, e. g.*, the Supreme Court, 1970 Term, 85 Harv.L.Rev. 64 (1971); Expatriation: Constitutional and Non-Constitutional Citizenship, 60 Calif.L.Rev. 1587 (1972).

**10.** *Cf.* this court's decision in *Rogers v. Patokoski*, 271 F.2d 858, 861 (9th Cir. 1959).

United States citizenship until he has had a reasonable opportunity to come to the United States as a United States citizen after learning of such claim to citizenship. Under the circumstances of this case, which clearly show that the applicant did not become aware of his possible claim to United States citizenship until February 1962 when he was so informed by officials at the American Consulate, was documented as a citizen by December 1962 and then proceeded immediately to the United States, it is concluded that citizenship has not terminated under section 301(b). The decision of the special inquiry·officer will be reversed.

Likewise, in *Matter of Farley*, 11 I. & N. Dec. 51, 53 (1965), the Board stated that:

In two other cases (*Matter of S—*, 8. I. & N. Dec. 221, and *Matter of S—*, 8 I. & N. Dec. 226 (1958)), the Board of Immigration Appeals had under consideration section 301(b), the identical section of law involved in the present case. In those two cases, factually the coming to the United States and consequently the beginning of physical presence in this country were not in sufficient time to permit a full five-years' presence to accumulate before twenty-eight years of age. The Board, nevertheless, concluded that the applicants were to be regarded as having constructively complied with the provisions of section 301(b). Similarly, in *Matter of S—*, Int. Dec. No. 1252 (1962), subject's absence abroad in the United States Armed Forces during the period of physical presence required by section 301(b) was regarded as constructive physical presence in the United States within the meaning of that section. The conclusions in these cases were based on the fact that failure to comply was due to circumstances beyond the control of the persons involved. In such cases it is equitable not to penalize individuals for circumstances beyond their control. Such a situation would also exist when the failure to come to the United States is due to ignorance of a claim to citizenship. In the instant case, it is concluded that the concept of constructive physical presence

is also applicable in accordance with the principle of law that no conduct results in expatriation unless it is engaged in voluntarily (*Nishikawa v. Dulles*, 356 U.S. 129, 78 S.Ct. 612, 2 L.Ed.2d 659 (1958)).

It is noted here, however, that both Board cases were decided prior to the *Bellei* opinion and were based on the rule established in expatriation cases that Congress had no power to take away citizenship without the citizen's assent. In the *Bellei* decision, the Court specifically held that that rule was not extended to non-Fourteenth Amendment citizenship. As stated by the Court:

We feel that it does not make good constitutional sense, or comport with logic, to say, on the one hand, that Congress may impose a condition precedent, with no constitutional complication, and yet be powerless to impose precisely the same condition subsequent. Any such distinction, of course, must rest, if it has any basis at all, on the asserted "premise that the rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive," *Schneider v. Rusk*, 377 U.S., [163], at 165, [84 S.Ct. 1187, at 1189, 12 L.Ed.2d 218] and on the announcement that Congress has no "power, express or implied, to take away an American citizen's citizenship without his assent," *Afroyim v. Rusk*, 387 U.S. [253], at 257, [87 S.Ct. 1660, at 1662, 18 L.Ed.2d 757]. But, as pointed out above, *these were utterances bottomed upon Fourteenth Amendment citizenship and that Amendment's direct reference to "persons born or naturalized in the United States." We do not accept the notion that those utterances are now to be judicially extended to citizenship not based upon the Fourteenth Amendment and to make citizenship an absolute.*

(Emphasis added.)

Aside from *Bellei*, only one federal case could be located which considered this question of the excuse of ignorance, and its holding is not dispositive of the issue in this case. In *Rucker v. Saxbe*, 552 F.2d 998 (3d Cir. 1977), *cert. denied* October 31, 1977, *sub*

*nom. Rucker v. Bell,* —— U.S. ——, 98 S.Ct. 392, 54 L.Ed.2d 275, the plaintiff was born to a citizen father and an alien mother in Argentina and at the time of his birth acquired United States citizenship under Section 1993. He did not set foot in the United States until he was 29 years old. It was found that the plaintiff was "subjectively unaware" of the retention requirements until he was about 28 or 29 years old. Plaintiff argued that, in general, the lack of specific knowledge of the retention provision should prevent its application and that the application in his case would be unfair. As to the first argument, the Third Circuit Court stated that:

> At oral argument, plaintiff's counsel urged that lack of specific knowledge of the provision should prevent its application no matter at what age a person who acquired citizenship at birth might apply for declaration of this right. The crux of plaintiff's argument in this regard appears to be the notion that Congress, in enacting the original retention provision and its successors, was primarily concerned with the entanglements which might result from having citizens with dual nationality and dual allegiance. Rucker contends that since he has never acted in a manner inconsistent with allegiance to the United States, the policy underlying the state has not been thwarted, and the fact that he failed to meet the terms of the retention provision should be ignored.
>
> Concededly, as plaintiff points out, "[l]iving abroad . . . is no badge of lack of allegiance . . . [and] may indeed be compelled by family, business, or other legitimate reasons." *Schneider v. Rusk,* 377 U.S. 163, 169, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964). But just as we recognize the consistency of extended periods of residence outside of the United States with continued loyalty and continued citizenship, the legitimacy of congressional regulation of the terms under which citizenship is offered in this context must also be respected.

*Id.,* at 1001.

As to the second argument, the court responded:

> " . . . he asserts that as to himself the application of the latter requirement is unfair due to his lack of specific knowledge of the retention provision and its requirements. While we recognize that it is conceivable for unfairness to arise from the application of the retention provision, we are not convinced that plaintiff Rucker's situation presents the excuse or hardship which might justify an abrogation of the congressional prerogative in setting administratively manageable standards and rational nexus requirements upon the extension of citizenship to children born abroad to alien and citizen parents.
>
> Plaintiff Rucker protests that he knew not of this statute—largely because his father kept this information from him—and that he assumed himself to be a citizen of the United States. We again refer to the district court finding that " . . . at no point along the line . . . when he [plaintiff] was full grown, did he undertake any rational inquiry" into his status, even though, as that court noted, his "behavior indicates that he was at least aware that there might be problems" regarding his United States citizenship, "and he felt it more prudent not to ask lest it prevent him from entering the U.S. altogether" (63a).
>
> We note in this regard that the record indicates that plaintiff Rucker was, and is, a man of some independence and ability.
>
> \* \* \* \* \* \*
>
> On these facts, we find the apparent absence of specific knowledge of the retention provisions no bar to their application.

*Id.* at 1003.

While the *Rucker* opinion, like the Supreme Court's decision in *Bellei,* does not completely resolve the issue now before us, there is language which seems to indicate that there may exist an excuse based on ignorance. The court recognized that it is "conceivable" that there could be a situation which "presents the excuse or hardship which might justify an abrogation of the

congressional prerogative in setting administratively manageable standards . . ." Id. at 1003. However, because Rucker was at least aware that there *might* be problems and yet failed to further investigate even though he had the ability to do so, the court did not find a sufficient excuse or hardship in this case.

It is clear from the examination of the legislative history of the Act of May 24, 1934, which added the retention requirements to Section 1993, that the questions of excuse and hardship were not considered by Congress and that it was assumed that the statutory provisions would mechanically be applied.[11] Likewise, after *Bellei*, there does not appear to be any constitutional impropriety in the application of Section 301(b) to non-Fourteenth Amendment citizens even though the failure to comply with the residency requirements may have been involuntary. Nevertheless, both the Supreme Court in *Bellei*, and the Third Circuit in *Rucker* suggest that there might exist situations which excuse such failure. The basis for such a holding is unclear and whether the excuse is to be automatically applied or used only if the equities weigh heavily in the individual's favor is not discussed.

We conclude there is no controlling precedent on this issue. However, it seems to us the language in *Bellei* and *Rucker* suggests the existence of the excuse of ignorance is merely dicta which must be considered as such in view of the actual holdings of the two cases. The Supreme Court in *Bellei* specifically held that the rule concerning the loss of citizenship only pursuant to the citizen's assent would not be applied to Section 1993 (and thereby to Section 301(a)(7)) citizens. Given that the loss of non-Fourteenth Amendment citizenship can constitutionally occur even if the individual does not voluntarily relinquish it, does it make a difference if the relinquishing was involuntary because of an ignorance of the statutory requirements, a lack of funds with which to reach this country, or some other reason? The *Bellei* decision provided for a distinction between Fourteenth Amendment and non-Fourteenth Amendment citizenship. This Court is found by it.

Moreover, Congress recognized the many hardships which result from the inflexible requirements of the statute,[12] and in 1972 extensively liberalized the retention requirements for citizens by descent. 3 Gor-

---

11. *See, e. g.*, 78 Cong.Rec. 7342 (April 25, 1934) wherein the following exchange occurred in the House of Representatives:

> Mr. DONDERO. On page 2, I notice that the child must come into the United States before its eighteenth birthday. Suppose the child comes into the United States when 20 years of age. What does the bill provide as to when the child may become a citizen of the United States?
>
> Mr. DIRKSEN. If it did not comply with the provisions of this bill, it would have to go through the ordinary course of naturalization.
>
> Mr. DONDERO. The same as any other alien?
>
> Mr. DICKSTEIN. Will the gentleman yield in order that I may answer the question?
>
> Mr. DIRKSEN. I yield to the gentleman from New York.
>
> Mr. DICKSTEIN. The gentleman is asking a legal question. He is asking when and what. If the child does not take advantage of this act, he comes in as an alien. If he does not comply with the terms of this law, he comes in as an alien.
>
> Mr. DONDERO. I am assuming that the child does not come in when 18, but waits until he is 20.

> Mr. DICKSTEIN. Then he comes in as an alien.

*See also*, comments of Senator O'Mahoney in 78 Cong.Rec. 8471 (May 10, 1934) to the effect that:

> "The child becomes a citizen at birth, but such citizenship is subject to defeasance by the omission of the child to reside in the United States or to take the oath. It will be observed that the pending bill does not provide that citizenship shall not descend but that the rights of citizenship shall not descend in certain cases."

12. *See* H.Rep. 92–1386, U.S.Code Cong. & Admin.News 1972, p. 4826. It is also noted here that the amendments made by Congress by the Act of October 27, 1972 to Section 301(b) of the Act occurred after the Supreme Court's decision in *Bellei*. Indeed, as noted by Representative Mink, 118 Cong.Rec. 36034 (October 13, 1972), Congress was aware of the Supreme Court's decision in *Bellei*. Nevertheless, Congress only modified, and did not abandon, the residency requirement, nor did it specifically provide for any exceptions to the application of the statutory provision.

don and Rosenfield Immigration Law and Procedure § 13.5 a at 13–32. However, Congress did not see fit to abandon a residency requirement or to provide for specific hardship cases by creating certain excuses for failure to comply with the statute. Unless this court finds some constitutional infirmity in doing so, it is obligated to follow the existing legislative regulation of this area.

In view of the clear language of Section 301(b), and the Supreme Court's holding in *Bellei,* the petition for review of the decision of the Board of Immigration Appeals is denied.

BURNS, J., dissents.