## MATTER OF DAVIS

### In Exclusion Proceedings

### A-7449011

*Decided by Board May 24, 1978*

(1) In cases involving loss of American citizenship, the law and the facts are to be construed as far as reasonably possible in favor of the claimant.

(2) Under the provisions of section 349(c) of the Immigration and Nationality Act, the burden is on the one asserting that a loss of citizenship occurred to prove that claim by a preponderance of the evidence.

(3) A voluntary renunciation of nationality in accordance with section 401(f) of the Nationality Act of 1940 (section 349(a)(5), Immigration and Nationality Act), was effective to accomplish expatriation even if the former citizen did not acquire another nationality, and became stateless.

(4) An Oath of Renunciation pursuant to section 401(f) of the Nationality Act of 1940 accomplished expatriation where there was a specific intent to renounce all allegiance to the United States and to become a "world" citizen.

(5) Since the United States is not a signatory to the United Nations Convention on the Reduction of Statelessness, U.N. Doc. A/CONF. 9/15 (August 29, 1961), its provisions have no applicability to loss of United States citizenship. Even if this were not the case, the Convention provides for voluntary renunciation of citizenship with resulting statelessness "where the national . _ . gives definite evidence of his determination to repudiate his allegiance."

(6) One who has lost United States citizenship by a voluntary oath of renunciation is no longer a national of the United States since a renunciation of citizenship embraces a renunciation of American nationality as well.

(7) Former citizen who executed an Oath of Renunciation of United States citizenship in 1948 to become a citizen of the world, who left the United States in 1961 and lived abroad for many years after his reentry permit expired, remarried in France, established a business, had three children born in that country, and entered the United States as a visitor in 1975, 1976, and 1977, held to have abandoned his status as a lawful permanent resident alien.

EXCLUDABLE: Act of 1952—Section 212(a)(14) [8 U.S.C. 1182(a)(14)]—No valid labor certification

Act of 1952—Section 212(a)(20) [8 U.S.C. 1182(a)(20)]—Immigrant, no visa

Act of 1952—Section 212(a)(26) [8 U.S.C. 1182(a)(26)]—Not in possession of a passport and nonimmigrant visa to enter the United States for a temporary visit

ON BEHALF OF APPLICANT:
    David L. Carliner, Esquire
    931 Investment Building
    1511 K Street, N. W.
    Washington, D. C. 20005

ON BEHALF OF SERVICE:
    George Indelicato
    Appellate Trial Attorney

BY: Milhollan, Chairman; Maniatis, Appleman, Maguire, and Farb, Board Members

In a decision dated May 17, 1977, an immigration judge found the applicant excludable under sections 212(a)(14), 212(a)(20), and 212(a)(26) of the Immigration and Nationality Act, 8 U.S.C. 1182(a)(14), (a)(20), and (a)(26) and ordered him deported from the United States. The applicant has appealed from that decision. The appeal will be dismssed.

The applicant for admission, Garry Davis, was born at Bar Harbor, Maine, in 1921. His father, Meyer Davis, was a famous American orchestra leader. Davis served in the United States Armed Forces during the Second World War as a bomber pilot. On May 25, 1948, he appeared at the United States Embassy in Paris and signed a "formal renunciation of nationality" in accordance with the provisions of section 401(f) of the Nationality Act of 1940, 8 U.S.C. 801(f), 54 Stat. 1169.[1]

Attached to the Oath of Renunciation at Davis' request, is a "Statement of Beliefs." This document contains Davis' reasons for signing the Oath of Renunciation.[2] Davis thus launched his career as the self-proclaimed "first citizen of the world."

---

[1] The Oath of Renunciation contained the following pertinent language:

I desire to make a formal renunciation of my American nationality, as provided by Section 401(f) of the Nationality Act of 1940, and pursuant thereto I hereby absolutely and entirely renounce my nationality in the United States and all rights and privileges thereunto pertaining and abjure all allegiance and fidelity to the United States of America.

[2] In this document, Davis stated:

In the absence of an international government, our world, politically, is a raw, naked anarchy. Two interglobal wars have shown that as long as two or more powerful sovereign nation-states regard their own national law as supreme and sufficient to handle affairs between nations, there can be no order on a planetary level. This international anarchy is moving us swiftly toward a final war.

I no longer find it compatible with my inner convictions to contribute to this anarchy—and thus be a party to the inevitable suicide of our civilization—by remaining solely loyal to one of these sovereign nation-states. I must extend the little sovereignty I possess, as a member of the world community, to the whole community, and to the international vacuum of its government—a vacuum into which the rest of the world must be drawn if it would survive, for therein lies the only alternative to this final war.

I should like to consider myself a citizen of the world.

All history has shown—and especially American history— that peace is not merely the absence of war, but the presence of a superstructure of law and order, in short, government, over non-integrated political units of equal sovereignty. The world today is split by seventy to eighty of these sovereign units. Therefore, without the immediate creation of this superstructure of world law and order, each unit must continue the idiotic, suicidal, unchristian and undemocratic anarchy of Nationalism, and the resulting

At the exclusion hearing below, Davis related how he declared a "world government" on September 4, 1953, while in Maine, "after having received a mandate of upwards of 675,000 individuals from all over the world who registered at the international registry [of] world citizens in Paris. The world government came about five years after my renunciation and was mandated by a registration of 750,000 people who declared themselves as world citizens from all over the world, more than 100 countries at the international registry of world citizens in Paris, which I also founded." (Tr. at p. 37)

Davis has frequently travelled across international borders with a passport issued by his "world government," which he calls the World Service Authority. This organization is based in Basel, Switzerland. Davis' passport lists his occupation as "world coordinator." His previous occupation was that of an actor.

Since 1948, Davis has travelled very extensively. He has made numerous trips back to the United States and has lived here off and on for considerable periods of time. From the record it is not always clear in what status he reentered this country.

Davis obtained an immigrant visa on March 10, 1950, and reentered the United States on April 3, 1950, after his sojourn in France. In his application for the visa, Davis listed himself as "stateless" in the space reserved for "Nationality." He remained in the United States until July 1950 and then returned to France. He encountered trouble with the Parisian authorities because he lacked proper papers. He then made his way to Haiti. There, he obtained another American immigrant visa on September 13, 1950, and reentered the United States a few days later. The immigrant visa application again lists his nationality as stateless. Davis lived in New York until 1953. He then went to London, where he had an acting engagement. He was deported back to the United States, against his will, when his work permit expired. He remained in New York from 1954 to 1956.

Sometime in 1956 he went to Bangalore, India. He came back to the United States in 1957. The record does not show in what status he reentered. He left the United States again in 1957, this time for Europe. In March 1958, he obtained yet another American immigrant visa from the American consulate general in Naples, Italy. Again he listed his nationality as "stateless." He reentered the United States on April 22, 1958, as a lawful permanent resident. He left for Europe in 1960, came

atomic-biological war will then level all political, economic, religious, and personal differences by death.

The real question today seems to be: World Citizenship or world war?

One leads to peace. The other leads to oblivion.

And the choice is ours.

back briefly in 1961, and left again for Europe early in 1961. At that time he was issued a reentry permit, valid until February 8, 1962.

Davis next reentered the United States "in the late sixties." "I was in France, married, in business, etc. I may have come back for family reasons, I can't recall at this moment." (Tr. at p. 17) The record does not indicate in what status Davis returned, or when "in the late sixties." The record does not indicate how long he stayed in the United States at that time, but the stay was brief. (Tr. at p. 43) The next time that he applied for admission to the United States for more than a brief visit was around June 1975; he sought to enter without any documents except his World Service Authority passport. Davis testified at the exclusion hearing which is before us for review that he was granted a waiver of the documentary requirements of the immigration law in connection with the June 1975 entry. However, he did not know whether he had been admitted as an immigrant or a nonimmigrant visitor. The possibility also exists that he was paroled into the United States under the provisions of section 212(d)(5) of the Immigration and Nationality Act, 8 U.S.C. 1182(d)(5).

Davis left the United States for France around September 1975. He came back to New York in April 1976, for his father's funeral. Again, he had only his World Service Authority passport; he was again granted a waiver of documents. Again the record does not show in what status he was admitted.[3] He then left the country, presumably for Europe, and returned on June 19, 1976. He applied for admission as a returning resident, that is, as "an immigrant, lawfully admitted for permanent residence, who is returning from a temporary visit abroad." Section 101(a)(27)(B) of the Act, 8 U.S.C. 1101(a)(27)(B). He was paroled into the United States for an exclusion hearing. Davis was charged with being an immigrant not in possession of a valid, unexpired immigrant visa. Section 212(a)(20) of the Act, 8 U.S.C. 1182(a)(20). The exclusion hearing was rescheduled several times and had still not been held by the time Davis left for France on November 3, 1976.

Davis next returned to the United States on January 30, 1977. This time he was in possession of a valid nonimmigrant visitor's visa. He was authorized to stay until April 30, 1977. He left for Europe on April 15. He returned on May 13, 1977, without any documents except his World Service Authority passport.

Davis' sworn statement was taken by an immigration officer at Dulles Airport. He was asked of what country he is a citizen. He replied: "None. I have no nationality. I renounced my nationality 1948 in Paris,

---

[3] Davis testified: "I was not seeking entry as a returning resident. I mean my reasons for entering were not even questioned. I was not asked why I was coming back, or why I was here. The immigration officials were waiting for me as I came out of the line at the airport." (Tr. at p. 26)

France." (Ex. 5) The end of the recorded interview reveals how Davis intended to enter the United States:

> Davis: . . . One question you forgot. On what basis do I desire to enter the United States?
>
> Officer: What is the basis?
>
> Davis: The World Service Authority passport is mandated by the Universal Declaration of Human Rights, article 13, section 2. I enclose a copy. Therefore, on the basis of this article I am returning to my native country.[4]

Article 13, section 2, states: "Everyone has the right to leave any country, including his own, and to return to his country." Davis was paroled into the United States for an exclusion hearing, which was held in Washington, D. C., on May 17, 1977.

The Immigration and Naturalization Service charged that Davis was excludable on two grounds: that he was either an immigrant without a visa, section 212(a)(20) of the Act, 8 U.S.C. 1182(a)(20), or a nonimmigrant without a visa, section 212(a)(26) of the Act, 8 U.S.C. 1182(a)(26); and that he was seeking to enter the United States for the purpose of performing skilled or unskilled labor without having acquired the necessary labor certification, section 212(a)(14) of the Act, 8 U.S.C. 1182(a)(14).

As a defense to these charges, Davis asserted, at various points of the exclusion hearing, that he is admissible as (1) a national of the United States; (2) a lawful permanent resident alien; and (3) a native of the United States, who, under the Ninth and Tenth Amendment, retains the right to live in his native country. Davis did not claim to be a United States citizen. Counsel conceded that he had effectively renounced his citizenship at the United States Embassy in Paris. (Tr. at pp. 27, 38–39, 47)

At the hearing, it was brought out that Davis is seeking to enter the United States on a permanent basis. (Tr. at p. 42) Indeed, his various defenses all show this. Davis conceded that he did not have an alien registration card, reentry permit, or any document other than his World Service Authority passport. (Tr. at pp. 47–48) Davis' purpose in coming to the United States was to take up his duties as chairman and president of the World Service Authority District 3, a nonprofit corporation in the District of Columbia. Davis' testimony indicated that he had maintained a place of residence in Washington, D.C., for some time prior to his most recent return to the United States.

Davis has several close relatives who are United States citizens. These include his mother, a brother, two sisters, and a 26-year-old

---

[4] The document Davis refers to is the Universal Declaration of Human Rights adopted and proclaimed on December 10, 1948, by the General Assembly of the United Nations.

daughter. He testified that he has three younger children who are French citizens. (Tr. at p. 33) Davis never became a French citizen or a citizen of any other country. He was divorced in February, 1977.

At the exclusion hearing, Davis was asked whether he had ever sought to regain his United States citizenship. He stated that he had asked to be "reinstated" as a United States citizen in 1950, but that his request was denied. (Tr. at p. 35) The Service trial attorney then explained the provisions of section 329 of the Immigration and Nationality Act, 8 U.S.C. 1440, and asked Davis if he wished to apply for citizenship as a person who served honorably in an active-duty status in the Armed Forces of the United States during the Second World War. Under section 329, no period of residence or physical presence in the United States is required; nor need the applicant have been lawfully admitted to the United States for permanent residence if he enlisted or was inducted while in the United States.[5] Davis stated that he did not wish to apply for citizenship under section 329. He did not offer any explanation for this decision. Presumably, he still objected to the idea of citizenship in a nation-state.

The Act defines "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to the United States." Section 101(a)(22), 8 U.S.C. 1101(a)(22). In support of his claim to be a "national of the United States," Davis testified that when he renounced his citizenship "it was in no way a disavow[al] of my loyalty or my love for my native country. In fact quite the contrary." (Tr. at p. 39) Davis was then asked if he regarded himself as owing allegiance to the United States Government. He answered: "Well insofar as my first allegiance is to a higher loyalty of whole in which the part can be protected, yes. And with that sense, my allegiance is to all the parts." (Tr. at p. 40) Davis was asked if he regarded himself as owing allegiance to the laws and the Constitution of the United States. He answered as follows: "Well, insofar as these laws equate with human rights and the normal, the commonalty of law by which people are governed, yes of course." (Tr. at pp. 40-41)

With regard to his claim to be a permanent resident of the United States, the following dialogue between Davis and his attorney at the exclusion hearing is pertinent:

Q. What country did you regard as the country of your permanent residence [in the period after 1961]?

---

[5] The Service trial attorney stated that Davis was eligible for citizenship under section 329. We note the reference in section 329 to "any person, who, while an alien or a noncitizen national of the United States, has served honorably. . . ." Davis was, of course, a United States citizen when he served. However, we do not meet the issue of his eligibility for citizenship.

A. Being stateless, whatever country I was in; I limited my residence by definition. So, I always had to renew continuously my residence papers in any country in which I was. As far as I am concern[ed] my native land, I have said is still America, the United States of America, and always will be, I can't deny that.

Q. D[id] you regard the United States then as the country of your permanent residence while you were travelling in other countries?

A. In principle, yes. Although I did not establish a residence here.

In subsequent testimony, Davis remarked that he was always received by his family when he returned to the United States. He freely admitted, however, that when he was not in the country he did not maintain an address, residence, or assets, such as furniture or clothing here.

The immigration judge ordered Davis excluded and deported "for the reasons set forth by the Government." Davis appealed the immigration judge's decision to this Board.

On appeal, Davis, through counsel, argues for the first time that he is a citizen of the United States. He argues, in the alternative, that he is admissible as a "national of the United States." Nowhere in the brief or at oral argument did counsel argue that Davis is, in the alternative, a lawful permanent resident of the United States. However, we will consider that possibility since Davis did make such a claim at the exclusion hearing below.

I

Counsel's entire brief and nearly all of his oral argument are devoted to the proposition that Davis is a United States citizen. We start from the premise that in cases involving the loss of nationality, the law and the facts are to be construed as far as reasonably possible in favor of the claimant. *Nishikawa* v. *Dulles*, 356 U.S. 129, 134 (1958); *Schneiderman* v. *United States*, 320 U.S. 118, 122 (1943). Nevertheless, we do not find counsel's arguments persuasive.

A. The first argument is that the "Statement of Beliefs" attached to Davis' 1948 Oath of Renunciation shows that "he had no intention of becoming an alien in his relationship to the United States, that his sole intention was to embrace the citizenship of a larger authority, namely a world government, and to have a concomitant allegiance. . . [T]here is nothing in stating allegiance to a world government . . . that suggests any implication that his allegiance thereto would necessarily conflict with his allegiance to the United States Government." (Tr. of oral argument at p. 3)

Had Davis merely declared his "world government" and carried out his activities as its head, we think that counsel's argument might have merit. However, the facts speak for themselves. Davis unequivocally renounced his citizenship and "abjured all allegiance and fidelity to the

United States of America." See footnote 1, *supra*. He evidently believed that allegiance to world government did conflict with continued allegiance to the United States. He freely renounced his allegiance for precisely that reason. At all times after he signed the Oath of Renunciation, Davis referred to himself as a stateless person. We think that those statements, as well as the words of the Oath of Renunciation and his "Statement of Beliefs" clearly show that Davis had a specific subjective intent to renounce all allegiance to the United States.[6] At the exclusion hearing itself, Davis refused to apply for United States citizenship under section 329 of the Act, while equivocally maintaining that he had some vague sort of residual loyalty to his native country.

Counsel conceded that "[t]here is no issue here as to whether Mr. Davis did what he did voluntarily, there is no duress when he appeared before the American consul. He is not claiming there was, that he was incapacitated in any way, that the conduct was not rational, but to the contrary he believes it was the most rational conduct he could engage in." (Tr. of oral argument at p. 6)

Counsel urges that in weighing his argument that the renunciation was ambiguous, the Government should have to show by clear, convincing, and unequivocal evidence that the renunciation was intended to sever Davis' allegiance to the United States. He argues that in 1961, when Congress changed the burden of proof required to establish loss of United States citizenship to that of a preponderance of the evidence, it meant only to affect the standard required for proving *voluntariness*.[7] Since voluntariness is not in issue here, counsel argues that the older standard should apply. He also argues that it is anomalous to have a preponderance of the evidence rule apply here, where United States citizenship is at stake, while the Government's burden of proof in a proceeding to establish the deportability of an *alien* is one of clear, convincing, and unequivocal evidence. *Woodby* v. *INS*, 385 U.S. 276 (1966).

Section 349(c) of the Immigration and Nationality Act, 8 U.S.C. 1481(c), as amended by section 19 of the Act of September 26, 1961, P.L. 87–301, 75 Stat. 656, speaks for itself.[8] It may be anomalous, but it is the

---

[6] We assume, without deciding, that a specific subjective intent to renounce United States citizenship is required for expatriation. See *King* v. *Rogers*, 463 F.2d 1188, 1189 (9 Cir. 1972); Gordon, "The Power of Congress to Terminate United States Citizenship—A Continuing Constitutional Debate," 4 *Conn. L. Rev.* 611, 628–629 (1972).

[7] Counsel cites certain language in House Report 1086 (1961), and argues that Congress was motivated by dissatisfaction with the Supreme Court's decision in *Nishikawa* v. *Dulles*, 356 U.S. 129 (1958), which imposed upon the Government the burden of establishing the voluntariness of an expatriating act by clear, convincing, and unequivocal evidence.

[8] Section 349(c) provides:

Whenever the loss of United States nationality is put in issue in any action or proceeding commenced on or after the enactment of this subsection under, or by virture

521

law which we must apply.[9] It clearly establishes a burden of proof of preponderance of the evidence, except upon the issue of voluntariness. There, the burden is on the person claiming United States citizenship to show that his act of expatriation was *not* performed voluntarily. See *King* v. *Rogers, supra,* at 1189. The discussion is academic in any event, because even if the Government's burden were one of clear, convincing, and unequivocal evidence, we would find that the Government had met that burden here.

B. Counsel for Davis next argues that section 349(a)(6) of the Act[10], 8 U.S.C. 1481(a)(6), should be construed to mean that a voluntary renunciation of American citizenship will be effective only if the person acquires another nationality. To interpret section 349(a)(6) otherwise would, it is argued, cause that provision to run afoul of the Ninth and Tenth Amendments to the Constitution. None of the authorities cited by counsel persuades us that his suggested construction of section 349(a)(6) is in accord with Congress' intent. He has cited no authority whatever to support his argument with regard to the Ninth and Tenth Amendments.

Related provisions of the Act demonstrate that counsel's construction of section 349(a)(6) is erroneous. Moreover, such direct authority as exists on this point supports the conclusion that a voluntary renunciation of citizenship under section 349(a)(6) is effective even though it results in statelessness. Section 349(a) provides:

From and after the effective date of this Act a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

\* \* \*

(6) making a formal renunciation of nationality before a diplomatic or consular

---

of, the provisions of this or any other Act, the burden shall be upon the person or party claiming that such loss occurred, to establish such claim by a preponderance of the evidence. Except as otherwise provided in subsection (b), any person who commits or performs, or who has committed or performed, any act of expatriation under the provisions of this or any other Act shall be presumed to have done so voluntarily, but such presumption may be rebutted upon a showing, by a preponderance of the evidence, that the act or acts committed or performed were not done voluntarily.

[9] We have no power to declare provisions of the statutes which we administer unconstitutional. *Matter of Cortez,* Interim Decision 2603 (BIA 1977); *Matter of Lennon,* Interim Decision 2304 (BIA 1974).

[10] Section 349(a)(6) is identical to section 401(f) of the Nationality Act of 1940. Since the relevant provisions of the Immigration and Nationality Act of 1952 are virtually identical to the corresponding provisions of the Nationality Act of 1940, further references will be made only to the Immigration and Nationality Act of 1952.

Section 405(c) of the 1952 Act, 8 U.S.C. 1101 (note), preserved the comparable loss of nationality provisions in the 1940 Act applicable to expatriating acts performed during the effective dates of the 1940 Act.

522

officer of the United States in a foreign state, in such forms as may be prescribed by the Secretary of State.[11]

It may be seen that the section, by its terms, does not make renunciation conditional upon the acquisition of another nationality.

Section 349(a)(7), 8 U.S.C. 1481(a)(7) provides for loss of nationality by making a formal written renunciation in the United States whenever the United States is at war and the Attorney General approves such renunciation.

Section 349(a)(8), 8 U.S.C. 1481(a)(8), provides for loss of nationality for deserting the United States Armed Forces in time of war.[12]

Section 349(a)(9), 8 U.S.C. 1481(a)(9), provides for loss of nationality for any act of treason against, or attempting by force to overthrow, or bearing arms against the United States.

Section 349(a)(10), 8 U.S.C. 1481(a)(10), provides for loss of nationality for departing from or remaining outside of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of avoiding training and service in the United States Armed Forces.[13]

Plainly, sections 349(a)(7) through 349(a)(10) provide for expatriation for acts which are not connected with the acquisition of a foreign nationality.

Section 349(a)(4)(A), 8 U.S.C. 1481(a)(4)(A), on the other hand provides for loss of nationality by "accepting, serving in, or performing the duties of any office, post, or employment under the government of a foreign state or a political subdivision thereof, *if he has or acquires the nationality of such foreign state.*" (Emphasis supplied.) The terms of section 349(a)(4)(A) indicate that Congress considered the acquisition of foreign nationality significant in that particular context. Therefore, it

---

[11] Counsel cites language from a Cabinet Committee report to the effect that section 401(f) of the Nationality Act of 1940 was "designed especially for the use of persons who shall have acquired at birth the nationality of a foreign state, as well as that of the United States, and who, upon reaching majority, elect that nationality of a foreign state. It is obvious that such person cannot obtain naturalization in the foreign state, since they are nationals thereof, and it frequently happens that there are no provisions in the laws of the foreign state of which they are nationals under which they may take an oath or make a formal affirmation of allegiance thereto, and thus divest themselves of their American nationality. . . ." *Revision and Codification of the Nationality Laws of the United States,* Part I, pp. 67–68 (June 13, 1938).

The fact that most people who expatriated themselves under section 401(f) and its successor provision in the 1952 Act were dual nationals does not in any way show that Congress intended to preclude American citizens who were not dual nationals from expatriating themselves under the same provision.

[12] This provision was declared unconstitutional in *Trop* v. *Dulles,* 356 U.S. 86 (1958).

[13] This provision was added in 1944. See 58 Stat. 746. It was declared unconstitutional in *Kennedy* v. *Mendoza-Martinez,* and *Rusk* v. *Cort,* 372 U.S. 144 (1963).

would seem that the absence of a similar proviso in section 349(a)(6) is not an oversight, a conclusion supported by the fact that foreign naturalization is itself made a ground for expatriation in section 349(a)(1).

Section 351(a), 8 U.S.C. 1483(a) provides:

> Except as provided in paragraphs (7), (8), and (9) of section 349 of this title, no national of the United States can expatriate himself, or be expatriated, under this Act while within the United States or any of its outlying possessions, but expatriation shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this chapter if and when the national thereafter takes up a residence outside the United States and its outlying possessions.

Congress evidently believed that certain acts, performed in the United States, should not result in expatriation unless the person thereafter took up a residence outside the United States. The way Congress defined "residence" (8 U.S.C. 1101(a)(33)) when read in relation to section 351(a), clearly shows that it did not want statelessness to be a bar to expatriation. See also section 352(a) of the Act, 8 U.S.C. 1484(a).[14]

In *Jolley v. INS*, 441 F.2d 1245 (5 Cir.), *cert. denied* 404 U.S. 946 (1971), a native-born United States citizen had gone to Canada and executed a formal Oath of Renunciation pursuant to section 349(a)(6). He did this to avoid military service during the Vietnam War. Despite the fact that Jolley would clearly become stateless, and would, unlike Davis, be permanently barred from entering the United States, even as an alien, *id* at 1257, the court found that he had expatriated himself. There is no hint or suggestion, even in the dissent, that section 349(a)(6) might not contemplate expatriation where it resulted in statelessness. See also *United States v. Lucienno D'Hotelle*, 558 F.2d 37, 42–43 (1 Cir. 1977). Similarly, legal scholars have assumed that a voluntary renunciation of American citizenship would be effective, even if statelessness resulted.[15]

It is true that there has been some movement in the international sphere to reduce the incidence of *involuntary* statelessness resulting from various national expatriation laws. The 1961 United Nations Conference on the Elimination or Reduction of Future Statelessness, in which the United States participated, adopted a Convention on the Reduction of Statelessness, U.N. Doc. A/CONF. 9/15 (August 29, 1961). Articles 5 through 9 of the Convention provided, in general, that any *involuntary* expatriation law of a signatory state is to be conditioned upon the person's possession or acquisition of another nationality. How-

[14] This provision was held unconstitutional in *Schneider v. Rusk*, 377 U.S. 163 (1964).

[15] Gordon, "The Citizen and the State: Power of Congress to Expatriate American Citizens," 53 *Georgetown L.J.* 315, 360–361 (1965); Fort, "Involuntary Expatriation: *Rogers v. Bellei*—A Chink in the Armor of Afroyim," 21 *Am. U. L. Rev.* 184, 205 (1971); Agata, 27 *U. Pitt. L. Rev.* at 39.

ever, as of 1970, only five countries had signed the Convention, and only one country, the United Kingdom, had ratified the Convention.

The United States has not signed or ratified the Convention. This country's reluctance to do so is "probably explained by its comments during the drafting stage, which specified that Articles 6, 7, and 8 of the Convention conflicted with . . . the Immigration and Nationality Act of 1952." [16] Even if the Convention becomes effective and the United States adheres to it, it would not affect Davis' case because it contains several exceptions, whereby expatriation could still result in statelessness. One exception is "where the national . . . gives definite evidence of his determination to repudiate his allegiance." [17] Thus, even the Convention on the Reduction of Statelessness deems it appropriate to allow for *voluntary* renunciation of citizenship where statelessness results.

## II

Davis contends that if he is not an American citizen, he is an American "national." The argument is that even if he did renounce his citizenship, this is not inconsistent with continued permanent allegiance to the United States. See section 101(a)(22) of the Act, *supra*. The argument fails for two reasons.

First, section 349 of the Act speaks in terms of "loss of nationality," not loss of citizenship. The Oath of Renunciation signed by Davis contained the same language:

> I hereby absolutely and entirely renounce my nationality in the United States . . . and abjure all allegiance and fidelity to the United States of America.

We hold that when a person renounces his citizenship, he necessarily renounces his American nationality as well.

Second, there is nothing in Davis' "Statement of Beliefs" or in his subsequent conduct which would make us doubt that he did intend to abjure *all* allegiance to the United States. Thus, even if it were possible to renounce one's citizenship while maintaining permanent allegiance to the United States, we would find that Davis had not done so.

In view of the above, we need not decide whether the statutory category "nationals of the United States" is exhausted by (1) citizens of the United States and (2) nationals at birth, as defined by section 308 of the Act, 8 U.S.C. 1408. [18]

Having found that Davis is not a United States citizen or national, it

---

[16] Duvall, "Expatriation Under United States Law, *Perez* to *Afroyim*: The Search for a Philosophy of American Citizenship," 56 *Va. L. Rev.* 408, 419 (1970).

[17] Id, n. 67.

[18] See the *Koszta* case, involving an Austrian subject who came to the United States, declared his intention to become an American citizen, and went abroad. Protection was granted on the theory that he had severed his relationship with Austria and had become

## III

follows that he is an alien. Section 101(a)(3) of the Act, 8 U.S.C. 1101(a)(3) defines an alien as "any person not a citizen or national of the United States."

It remains to be determined whether Davis is still a lawful permanent resident alien or whether he abandoned that status. It must be emphasized that Davis is excludable under section 212(a)(20) of the Act in either case, because he is in possession of no valid documents. However, if he is an alien returning to an unrelinquished lawful permanent residence in the United States, the normal documentary requirements may be waived pursuant to section 211(b) of the Act, 8 U.S.C. 1181(b). See 8 C.F.R. 211.1(b).[19] On the other hand, if he abandoned his permanent resident status, Davis must go through the process of obtaining a new immigrant visa. See section 211(a) of the Act, 8 U.S.C. 1181(a).

The Board has held that once a colorable claim to returning lawful resident status is established, the burden is on the Government to show that that status has been abandoned. *Matter of Kane*, Interim Decision 2371 (BIA 1975). See *Chew* v. *Rogers*, 257 F.2d 607 (D.C. Cir. 1958).

The last time that Davis appears to have been admitted to the United States for lawful permanent residence was in 1958. In determining whether his subsequent absences from this country were "temporary visits abroad" or whether they constituted an abandonment of status, we refer to the standards set out in *Matter of Kane, supra*. The basic standard is the intention of the alien, when it can be determined. Attention is given such factors as the purpose of departing, the length of the stays abroad, and the extent of the alien's ties with the United States.

Davis left the United States early in 1961, after having been issued a Permit to Reenter the United States (Form I-131). Information contained in the application for that permit indicates the following: that Davis was divorced, that he intended to be abroad in the United Kingdom, France, and West Germany on business for 17 days. His occupation and employer were given as travel agent and Transglobe Travel, Inc. of 119 West 57th St., New York. The permit, issued on February 8, 1961, was valid for one year.

Davis did not return for a number of years after the permit had expired. During his absence, he lived in France, remarried, and went into business. His three younger children were born. Although Davis does not remember exactly when or why he returned to the United States, he concluded at the hearing that it was sometime in the late

---

an American "national" entitled to protection. 2 Wharton, *Digest of International Law*, 357-358 (1886). See also *Agata*, 27 *U. Pitt. L. Rev.* at 39, n. 171.

[19] As a permanent resident, Davis would also be exempt from the labor certification requirements of section 212(a)(14) of the Act.

sixties and that he had probably come back for "family reasons." (Tr. at p. 17) He characterized the trip as brief. (Tr. at p. 43)

Davis traveled to the United States in 1975, 1976, and 1977, and remained for approximately three months each time. Referring to the 1975 visit, he explained that he had "come over for a World citizen assembly of San Francisco." (Tr. at p. 25) With respect to his arrival in June 1976, Davis testified that he was not seeking entry as a returning resident. (Tr. at p. 26) Although a hearing was scheduled to determine his status, he returned to France before the hearing was held. Before his next visit to the United States in 1977, Davis secured a B-2 visa at Strasbourg, France, as a nonimmigrant visitor for pleasure. A nonimmigrant visitor is defined in section 101(a)(15)(B) as "an alien . . . having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure." As a visitor, Davis arrived on January 30, 1977, and was authorized to remain for three months. Two weeks before his visa expired, he returned to France. A divorce had apparently been granted in February, while he was in the United States. On May 13, 1977, he made his most recent application for admission, with no documents except his World Service Authority passport.

From Davis' testimony it is apparent that his soujourn in Europe after 1961 cannot be characterized as a "temporary visit abroad." For nearly 16 years Davis lived in Europe—principally in France—where he married, raised a family, and engaged in business. His periodic trips to the United States were of brief duration and appear to have been for family or business reasons. We can find no indication that he intended to maintain his resident status throughout his absence. His decision in late 1976 to secure a nonimmigrant rather than an immigrant visa from the United States consulate in France corroborates our conclusion that Davis abandoned his status after 1961. He did not take steps to reacquire that status.

We note that Davis has obtained three immigrant visas in the past. He has several immediate relatives who are United States citizens. Any of them might submit the necessary visa petition in his behalf.

We find that Davis is excludable under section 212(a)(20) of the Immigration and Nationality Act. He is not excludable under section 212(a)(26) because he was not a nonimmigrant. There is no evidence concerning whether Davis is coming to the United States to perform labor, so the applicability of the exclusion ground under section 212(a)(14) remains in doubt; however, because of our disposition under the section 212(a)(20) ground, we deem it unnecessary to look further into the alleged requirement of a labor certification. The appeal will be dismissed.

ORDER: The appeal is dismissed.