Harald **SCHLEIFFER, a minor by next friend Ann Ker, Plaintiff-Appellant,**

v.

Edward J. **MEYERS, as Judge of the Whitley Circuit Court of Whitley County, Indiana, Defendant-Appellee.**

No. 80–2240.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1980.

Decided March 16, 1981.

As Amended March 18, 1981.

Donald D. Doxsee, Fort Wayne, Ind., for plaintiff-appellant.

John S. Bloom, Columbia City, Ind., for defendant-appellee.

Before SPRECHER and CUDAHY, Circuit Judges, and WILL, Senior District Judge.*

SPRECHER, Circuit Judge.

This is an appeal from the final judgment of the District Court for the Northern District of Indiana dismissing plaintiff's petition for an injunction for failure to state a claim upon which relief can be granted. This is a civil rights case under 42 U.S.C. § 1983 by Harald Schleiffer, a minor, brought by next of friend, Ann Ker, against Edward J. Meyers, in his capacity as Judge of the Whitley Circuit Court, Whitley County, Indiana. Harald sought an injunction against enforcement of an order of the Circuit Court of Whitley County, Indiana, enforcing a Swedish decree awarding custody of Harald, a ten-year-old American citizen, to his mother, Hjordis Schleiffer, a resident and citizen of Sweden, and a subsequent

* Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois is sitting by designation.

order instructing Harald's father, John Schleiffer, to arrange for Harald to be returned to his mother in Sweden.

I

The unique nature of this action necessitates a rather detailed review of the facts. The facts, as gleaned from the briefs, the memorandum opinion below, and the opinion of Judge Meyers in the Indiana proceeding, appear to be undisputed.

Harald's parents were married in Norway in 1970. Harald was born July 17, 1970, in Sweden, where his parents had moved. At the time of Harald's birth, his father was an American citizen, and his mother was a Swedish citizen. Harald's birth was reported to and recorded by the United States Department of State on May 1, 1971. Harald's American citizenship was confirmed by a "Certificate of Birth Abroad of a Citizen of the United States" issued by the Department of State on October 25, 1978.

In May, 1976, John Schleiffer went to the Dominican Republic and commenced an action for divorce and for custody of Harald. Hjordis Schleiffer was without knowledge of these proceedings and received no notice or service of summons. On June 11, 1976, John took Harald to the United States to visit his grandparents in New Jersey. John wrote Hjordis on July 19, 1976, informing her of his desire for a divorce, but failing to inform her of the pending Dominican Republic proceeding. On July 29, 1976, a final decree of divorce and custody was awarded by default to John in the Dominican Republic proceeding. Hjordis first learned of this divorce decree in February, 1978. During the summer of 1976, John also commenced a proceeding for divorce and custody in the courts of New Jersey. Hjordis received service of process by mail. The resolution of this proceeding is unclear and appears to be immaterial to the issues before us.

Harald and his father returned to Sweden in August, 1976, and his parent's mar-

riage was "reconciled". However, on December 18, 1977, Harald's parents filed a joint application for divorce in the District Court, Gothenborg, Sweden. It appears that in the application for divorce, the parties agreed that Hjordis should have custody of Harald. The Swedish court issued orders pendente lite that Hjordis have possession of the family residence, that Hjordis have custody of Harald, and that John pay support for Hjordis and Harald. During March, 1978, John, through his Swedish counsel, sought unsuccessfully to modify the pendente lite custody award.

On August 30, 1978, John, under the guise of taking Harald to Germany for a short vacation, brought Harald to the United States. Harald has remained in the United States in the care and custody of his father ever since.

In November, 1978, John, through his Swedish counsel, filed an application for absolute divorce in the Swedish divorce action. Harald's father sought, among other things, custody of Harald. A hearing was held in Gothenborg District Court on January 29, 1979, on the issues of divorce and custody. Harald's father appeared through his attorney, while Hjordis appeared personally and with counsel. Harald was not present at the hearing. On February 12, 1979, the Swedish court issued its decision granting the divorce and awarding custody of Harald to Hjordis. The court found, *inter alia*, that the parents had agreed in their application for divorce that Hjordis retain custody of Harald, that John had removed Harald to the United States without Hjordis' consent, and that these circumstances proved John to be less suitable as custodial parent. John has refused to comply with the Swedish court's award of custody and has not returned Harald to his mother's care and custody.

Even before the Swedish proceedings were final, Harald's father filed a "Motion for Provisional Order and Temporary Restraining Order Without Notice" in the Circuit Court of Whitley County, Indiana. This motion was supplemented on June 15, 1979, with a "Petition for Custody" praying that Harald be officially placed in his father's custody. The record before us is incomplete as to what proceedings were held in the Indiana action. It is clear, however, that Hjordis came to the United States to defend against the father's request.

Judge Meyers issued his decision on July 1, 1980. He concluded that the Indiana Uniform Child Custody Jurisdiction Act, I.C. 31–1–11.6–1, et seq., applied to the case. He specifically found that the Swedish custody decree should be given international recognition pursuant to I.C. 31–1–11.6–23, which gives recognition to custody decrees rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.[1] Judge Meyers then held that the Swedish decree was rendered pursuant to jurisdictional prerequisites substantially in accordance with Indiana law and that the Swedish court "has not declined to assume continuing jurisdiction to modify the initial decree." Therefore, Judge Meyers ruled that I.C. 31–1–11.6–14 prevented the Indiana courts from taking subject-matter jurisdiction of the custody petition. The court also refused, pursuant to I.C. 31–1–11.6–8(b),[2] to exercise its jurisdiction because John had removed Harald from the physical custody of his mother without her consent and in violation of the Swedish decree. Judge Meyers additionally declined to exercise jurisdiction because Indiana was an "Inconvenient Forum," and the exercise of

---

1. See footnote 7 *infra*.

2. I.C. 31–1–11.6–8(b) states:
   Unless required in the interest of the child, the court shall not exercise its jurisdiction to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody. If the petitioner has violated any other provision of a custody decree of another state the court may decline to exercise its jurisdiction if this is just and proper under the circumstances.

jurisdiction would affront various purposes of the Indiana Uniform Child Custody Jurisdiction Act. He finally concluded that under I.C. (1971), were no bar to federal court consideration of Harald's claim. But, the court concluded that the Anti-Injunction Act, 28 U.S.C. § 2283, prohibited the court from granting Harald's petition for injunctive relief. The court reasoned that this case was not a civil rights case, but was only a child custody contest. To the district court, Judge Meyers' orders were nothing more than an award of custody. Consequently, since there was no civil rights violation to lift the prohibitions of the Anti-Injunction Act, the district court dismissed Harald's petition. Harald appealed to this Court. We have stayed enforcement of Judge Meyers' orders pending resolution of this appeal.[3]

The unique role in our society of the family, the institution by which "we inculcate and pass down many of our most cherished values, moral and cultural," *Moore v. East Cleveland*, 431 U.S. 494, 503–504, 97 S.Ct. 1932, 1937–38, 52 L.Ed.2d 531 (1977) (plurality opinion), requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children. We have recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing.

## II

■ Parents have a primary constitutional right to direct the upbringing and education of their children while under their control.[4] "This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S.Ct. 1526, 1541, 32 L.Ed.2d 15 (1972). But, children also have constitutional rights independent of those afforded their parents.[5] A child's constitutional rights, however, are not always equal to similar rights of an adult.[6] In *Bellotti v. Baird*, 443 U.S. 622, 634, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979), the plurality opinion by Justice Powell observed:

## A.

■ Before considering the pertinent factors involved in the present case and then balancing the constitutional claims of the custodial parent and the child, it is important to note one additional factor that pervades the parent-child relationship. Obviously, the ordinary dispute between a parent and child does not arise as a civil rights issue since it would lack the requisite state action in support of one side or the other. In those situations where there is state involvement, the outcome of the parent-child conflict often turns on whether the state chooses to exercise its discretionary power to favor one side or the other. The result, therefore, is often determined by state law

---

**3.** This appeal was docketed on September 3, 1980, and five days later Harald petitioned for a stay, which was denied on September 12, 1980 by a motion panel of three judges other than this panel. Harald's petition to reconsider the denial of a stay was denied on September 25, 1980. A brief second petition to reconsider, citing no new matter, resulted in the granting of a stay on November 3, 1980 by the motion panel, which stated no reasons for granting the stay.

**4.** *Quilloin v. Walcott*, 434 U.S. 246, 255, 98 S.Ct. 549, 554, 54 L.Ed.2d 511 (1978); *Ginsberg v. New York*, 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442,

88 L.Ed. 645 (1944); *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 401, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923).

**5.** *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Kent v. United States*, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).

**6.** For example, see *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (no constitutional right to a jury trial in juvenile court).

and state decision, not by constitutional mandate. The constitutional balancing frequently will permit either outcome to the child-parent dispute. *See Developments in the Law—The Constitution and the Family,* 93 Harv.L.Rev. 1156, 1377, 1383 (1980).

First, we consider the importance of the parental role in child rearing. Harald was reared by his mother and father in Sweden for his first six years. After a two-month visit with his father to the United States, he and his father returned to Sweden, where he lived for two more years with his mother (and presumably also with his father). Under the guise of taking Harald to Germany for a short vacation, his father took him to the United States on August 30, 1978, where he has since remained. Having spent eight years in Sweden with his mother, he is no stranger to either his mother or her country.

The father, who had himself petitioned the Swedish court for an absolute divorce and was fully represented therein, was found by that court "to be less suitable as custodial parent of the child." That finding is understandable inasmuch as the father had previously agreed in writing that the mother should have custody, and yet he fled Sweden with the child. Two years earlier, the father had fled Sweden with Harald while he tried unsuccessfully to obtain a divorce in both the Dominican Republic and New Jersey. The father also brought the Indiana proceedings which recognized the Swedish decree and ordered that Harald be sent to his mother in Sweden.

We know little of Harald's mother except that she has prevailed in both the Swedish and Indiana courts. She also came to the United States in order to appear before the Indiana court. It is important to note that in Harald's skeletal petition in these federal proceedings, there is no allegation that his mother is unfit in any way; no allegation as to where or in whose custody Harald would end up if he prevailed here; no allegation as to the identity of Ann Ker, who brought this suit as Harald's "next of friend;" no allegation as to whether Ann Ker intends to assume the role of custodial parent, or her fitness to so act; and no allegation of the fitness of Harald's father if he intends to act as custodial parent. But most important, there is no allegation that relates in any way to the best interest of Harald or that attacks in any way the validity, integrity, or continuing viability of either the Swedish decree or the Indiana decree enforcing the Swedish decree. We are left with the unchallenged assumption that it is in Harald's best interest to be under the care and custody of his mother.

■ The implications of this suit leave the upbringing and education of Harald in a total vacuum. Even if we assume that Harald was mature enough to seek independent counsel or at least to acquire a next of friend who had his best interest in mind, we cannot assume that at age 10½ Harald is mature enough to become emancipated and to provide for himself. To comply with Harald's petition to enjoin the Indiana decree would be to leave Harald without a parental custodian.

### B

This brings us to the second factor to be considered: the inability of a child to make critical decisions in an informed, mature manner. We must assume on the bare record before us that Harald is acting upon his own preference, but in considering that preference we cannot isolate ourselves from reality. As the comprehensive Harvard Law Review comment on familial constitutional rights has noted:

But although a young child may indeed be competent to make many important personal decisions, there is a strong reason to doubt his ability to make an enlightened decision as to which parent should be his guardian. A child's preference in such circumstances is uniquely likely to be based on considerations that run counter to his own long run best interests. For example, many children may automatically prefer the more lenient parent; many may be psychologically impelled to vent anger or act so as to punish one of the parents for getting a divorce. Perhaps most important, there

is a strong likelihood that the choice will be improperly influenced by parental threats or promises.

*Developments in the Law—The Constitution and the Family*, 93 Harv.L.Rev. 1156, 1346–47 (1980) (footnotes omitted).

These considerations lead to the factor of the peculiar vulnerability of children. Either Harald already has been put through the trauma of suing to displace his natural mother as his guardian or he is unaware of the suit because it conceivably could have been filed by others without his knowledge. In either case, it would be even more traumatic for Harald to be brought before the court in a formalized fact finding hearing, or even before the federal district judge in chambers, to determine his actual preference as between his parents. This could be in the worst interest of Harald, see *Parham v. J. R.*, 442 U.S. 584, 610, 99 S.Ct. 2493, 2508, 61 L.Ed.2d 101 (1979), and not particularly helpful to a solution.

Moreover, we must put Harald's preference to reside in the United States in the context of the entire family picture. Harald may indeed prefer to live in the United States, but we question whether the preference would still exist if it means the destruction, or deterioration of other family relations. In this case, the Swedish court, and indirectly the Indiana state court, have determined that, on balance, it is in Harald's best interest to maintain a family life with his mother. That Harald will be in the care, custody, and control of his mother necessarily implies some restriction upon Harald's own preferences, such as his desire to live in the United States. But, the balancing decision made by the Swedish court and the tradeoffs implicit within family life do not necessarily deny Harald his constitutional rights. Harald will remain an American citizen, will reside in a free country, and will retain his freedom to choose where he shall live once he is emancipated from his custodial parent. To exalt a ten-year-old's choice of residence over the larger question of which parent will care for him in his best interest would be to invert and subvert the normal family hierarchy.

Finally, we consider the state involvement. Indiana law requires that its courts give full faith and credit to foreign decrees substantially in conformity with a decree entered within a state of the United States. Ind.Code 31–1–11.6–23.[7] The Indiana court has accordingly determined to enforce the Swedish decree.

■ Each of the above considerations leads us to conclude that in the context of this child custody situation the constitutional rights of the child cannot be equated with those of an adult.

### C

We must next consider what constitutional rights Harald seeks to claim. His petition and memorandum in the district court and his briefs in this court indicate that his most precise claim is that the Indiana decree amounts to a "deportation" from the United States and that a citizen cannot be deported. He broadly claims violation of due process and equal protection under the Fourteenth Amendment.

The "deportation" argument is based upon the constitutional right to travel, to exercise a choice of residence, and to leave or stay in the United States as one chooses. *Kent v. Dulles*, 357 U.S. 116, 125, 78 S.Ct. 1113, 1118, 2 L.Ed.2d 1204 (1958). That this undoubted right in adults is not always absolute in children has been adjudicated several times in the context of what has been called de facto deportations, that is, where deportable aliens have sired children born in the United States who are therefore American citizens. Many courts of appeal have concluded that the constitutional rights of such citizen-children are not vio-

---

7. Ind.Code 31–1–11.6–23 provides:

    The general policies of this chapter extend to the international area. The provisions of this chapter relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involv-ing legal institutions similar in nature to custody rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.

lated when the deportation of their parents necessitates the children's de facto deportation.[8] In such cases, it has been noted that the child's return to the foreign country "will merely postpone, but not bar, [his or] her residence in the United States if [he or] she should ultimately choose to live here." *Acosta v. Gaffney*, 558 F.2d 1153, 1158 (3d Cir. 1977).

In *Schneider v. Rusk*, 377 U.S. 163, 168–69, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964), the Supreme Court said:

> A native-born citizen is free to reside abroad indefinitely without suffering loss of citizenship.... Living abroad, whether the citizen be naturalized or native born, is no badge of lack of allegiance and in no way evidences a voluntary renunciation of nationality and allegiance. It may indeed be compelled by family, business, or other legitimate reasons.

Consequently, we do not consider Harald's constitutional right to be an absolute bar to his custodial parent's decision to reside in Sweden. His constitutional right to travel and to reside in the United States is one of several rights involved in the family relationship. Harald retains his citizenship and his rights to return to the United States as an adult.

### D

Before considering Harald's broader claims of deprivation of due process and equal protection, it is pertinent to observe that the whole subject of domestic relations, and particularly child custody problems, are generally considered state law matters outside federal jurisdiction.[9] The single federal case with facts close to those in our case was resolved by federal deference to state authorities.

In *Bergstrom v. Bergstrom*, 623 F.2d 517 (8th Cir. 1980), the District of Columbia Superior Court had granted custody in 1978 over a then seven-year old child to her mother, who lived in Norway, during the school year, and to the father, who lived in North Dakota, during the summer. While the child was in North Dakota for the summer, the guardian ad litem for the child filed a federal action, claiming that the child's removal from the United States at the end of the summer violated her constitutional right as a citizen to live in the United States. The district court, after the submission of the report of a court appointed psychiatrist, held that the child possessed a constitutional right to remain in the United States, but that the question of custody *within* the United States should be determined in the state court. 478 F.Supp. 434 (D.N.D.1979). The father then filed a custody action in the appropriate North Dakota court. That court granted total custody to the mother in Norway and found that the father's litigation of custody and his violations of the District of Columbia decree had resulted in emotional damage to the child. The North Dakota decree was appealed.

While that appeal was pending, the Eighth Circuit Court of Appeals vacated the federal district court's judgment on the ground that the constitutional issue of the child's right to remain in the United States was not ripe for decision and that the district court should have dismissed the child's complaint. 623 F.2d at 519. Citing *In re Burrus* and similar cases, the Court of Appeals said that "[r]eexamination of custody arrangements is a matter which belongs exclusively in state court." *Id.* at 520.[10]

---

8. *Gonzalez Cuevas v. Immigration and Naturalization Service*, 515 F.2d 1222, 1224 (5th Cir. 1975); *Cervantes v. Immigration and Naturalization Service*, 510 F.2d 89, 91–92 (10th Cir. 1975); *Enciso-Cardozo v. Immigration and Naturalization Service*, 504 F.2d 1252, 1253–54 (2d Cir. 1974); *Robles v. Immigration and Naturalization Service*, 485 F.2d 100, 102 (10th Cir. 1973); *Perdido v. Immigration and Naturalization Service*, 420 F.2d 1179, 1181–82 (5th Cir.

1969); *Mendez v. Major*, 340 F.2d 128, 131–32 (8th Cir. 1965).

9. *In re Burrus*, 136 U.S. 586, 593–94, 10 S.Ct. 850, 852–53, 34 L.Ed. 500 (1890); *Huynh Thi Anh v. Levi*, 586 F.2d 625, 632 (6th Cir. 1978).

10. The Supreme Court of North Dakota subsequently reversed the lower state court and reinstated the original custody decree of the District of Columbia court insofar as the split

The *Bergstrom* case reinforces our belief that the child's residential preference properly is considered and resolved in the state court's custody proceedings designed to determine what is in the best interest of the child. The *Bergstrom* case also proves that the lengthy legal battles in state and federal courts may leave the child in a serious emotional state, despite the fact that the federal litigation presumably was initiated by the child.

The recent decision of the Second Circuit, in a case involving constitutional conflicts similar to those here, resolves Harald's remaining due process and equal protection claims. In *Leonhard v. United States*, 633 F.2d 599 (2d Cir. 1980), the mother and father were divorced and the mother was awarded custody of three children. She married a man who thereafter began to serve a prison sentence. The prisoner later entered into an arrangement with the federal government whereby in return for testifying against certain members of organized crime, he and his family were given new identities and were spirited away to a new and secret location. For several years, the father of the three children was not only deprived of visitation, but insofar as he knew, his children had disappeared completely from the face of the earth. He sued on behalf of himself and his children, claiming that the children's constitutional right not to be consigned to the company of a convicted criminal and their right not to be secreted out of the reach of their father were violated.

The Second Circuit Court of Appeals affirmed the district court's dismissal of the children's constitutional claims, concluding that the federal defendants' "reliance on . . . [the mother's] consent to the removal and concealment of the children to protect them from organized crime, did not deny the children due process of law." 633 F.2d at 620–21 (footnote omitted). The court said at 620:

This conclusion finds support in the recent decision of the Supreme Court in *Parham v. J. R., supra* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979). Involved there was the question whether the state could constitutionally rely on a decision by a child's parent or guardian to commit the child to a mental institution without a hearing before or after the commitment. The Court held that despite the child's substantial liberty interest in not being confined, he has no constitutional claim when his parent or guardian has decided that he should be placed in a mental hospital and the hospital psychiatrists have determined that he needs treatment. *Id.* at 606–13, 99 S.Ct. at 2506–2510. The liberty interest in *Parham* was clearly more substantial than the interest of the children here in the possibility of periodic visits from their father. And the effect of the parents' decision in *Parham*, i. e., the complete removal of the child from any family environment, was far more drastic than the effect here of the children's relocation accompanied by their mother. Since, as was held in *Parham*, a child has no right to a hearing when his parent decides to obtain needed medical treatment for him by transferring him from the family to the confinement of a mental institution, *a fortiori* children have no cause to complain when their custodial parent and the government officials charged with such functions decide to protect their safety by relocating and concealing them, with their parent. If the more drastic intrusion does not require a hearing, surely the less drastic intrusion does not.

■ Permitting Harald to be returned by his father to Sweden, where he had spent his first eight years, is neither as drastic as the placement of a child into a mental institution as in *Parham*, nor as drastic as secreting children from their father as in

custody of both parents was involved. However, the court also held that the child should remain in the United States, not as a constitutional right but in the child's best interests. The court concluded that "the recommenda-

tions of expert witnesses on both sides dictate that it is in Ida's best interests to receive professional help in the form of therapy or counseling." *Bergstrom v. Bergstrom*, 296 N.W.2d 490, 491 (N.D.1980).

*Leonhard.* Enforcement of the Swedish custody decree by the Indiana court poses no constitutional deprivation to Harald.

### III

■ In summary, balancing the constitutional rights of the custodial parent and the child, and considering all of the factors which affect this case, we conclude that Harald Schleiffer has not suffered a judicially remediable deprivation of civil rights which, as the district court has held, would be sufficient to overcome the obstacles interposed by the Anti-Injunction Act. Although Harald's best interest is for the determination of the Indiana or Swedish courts, we note in passing that the record before us indicates that his best interest will be advanced by terminating this proceeding as promptly as possible and allowing the state court to proceed.[11]

The judgment of the district court is affirmed.

CUDAHY, Circuit Judge, concurring.

I concur fully in Judge Sprecher's excellent opinion in this murky and potentially tragic impasse but wish to elucidate what seems the heart of the matter to me.

Harald seeks recognition for either (1) a constitutional right, as a citizen, to remain in the United States, or (2) a right to a due process hearing with respect to the order sending him to Sweden and depriving him of a constitutionally protected liberty interest. Parenthetically, I think it plausible

---

**11.** On December 28, 1980, the President approved Public Law 96–611, which provides that the Federal locator service may be used in connection with the enforcement of a child custody decree and in cases of parental kidnapping; and provides specifically that the existing provision of the Criminal Code dealing with flight to avoid prosecution or giving testimony, 18 U.S.C. § 1073, shall apply in the case of parental kidnapping. This law provides a current assessment of the Congressional attitude toward parental kidnapping.

**1.** I deem it immaterial, when one parent has lawful rights to custody of the child, that the decision to live in Sweden has been made by only that parent. *See Leonhard v. United States,* 633 F.2d 599, 619 & n.28 (2d Cir. 1980).

---

that Harald does in fact presently want to stay in the United States. Children generally prefer things as they are, and, at ten or eleven, "home" is where they have been for the last year or two.

However,

[t]he involvement of a constitutional right for minors by no means lifts a case above the practical and policy problems of minority status into some abstract sphere in which an abandonment of that special body of law that has always applied to children is justified. When both parents and children are involved, ... the law must concern itself even more with that special context, since a court must then confront the unique legal and social role of parents.

Hafen, *Children's Liberation and the New Egalitarianism: Some Reservations About Abandoning Youth to Their "Rights",* 1976 B.Y.U.L.Rev. 605, 641. Although there is sufficient state action here to invoke the protections of the Constitution, *see Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), the real conflict from a federal viewpoint in the instant case is between Harald's desire to remain in this country and the essentially private action of his mother in choosing to live in Sweden.[1] Any evaluation of the scope of Harald's protection under the Constitution must focus on our concern with Harald's rights to be protected against a parental decision that he thinks is contrary to his interests.[2] While such rights to override parental pow-

---

Harald does not challenge his mother's right to custody; he is willing to remain in her custody if she elects to live in the United States. Appellant's Brief at A–10. Certainly the factors considered by the Swedish court in awarding custody are not relevant to a determination of Harald's rights under the Constitution.

**2.** This distinguishes this case from others establishing constitutional rights for children where the parents side with the child against the state. *E. g., Tinker v. Des Moines School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *In re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). In such cases, a minor's constitutional rights pose no disruptive problems for the family.

ers of decision having the support of state laws have been recognized in other contexts, *e. g., Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976); *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), those individual circumstances were closely linked with the arguably crucial or irrevocable nature of the interest asserted by the child and the correspondingly diminished interest of the parents. But in the more common case, "[l]egal restrictions on minors, *especially those supportive of the parental role,* may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding." *Bellotti,* 443 U.S. at 638–39, 99 S.Ct. at 3045–46 (emphasis supplied).

Minors, as well as adults, are protected by the Constitution, however, even when that protection operates to subvert the normally dominant parental role. For example, in *Planned Parenthood of Central Missouri v. Danforth,* 428 U.S. 52, 72–75, 96 S.Ct. 2831, 2842–43, 49 L.Ed.2d 788 (1976), the Court evaluated the right of a pregnant minor to an abortion under a state statute requiring the consent of a parent to such an abortion. The Court struck down the statute because the interest of the minor child in making a decision of such consequence, assuming sufficient maturity, was deemed paramount over any asserted right of parental control. The Court reached this conclusion despite the complex medical and ethical considerations involved in the decision to undergo an abortion. But, as was emphasized in a subsequent decision, *see Bellotti,* 443 U.S. at 642, 99 S.Ct. at 3047–48, the grave and irrevocable consequences that could flow from unwanted motherhood presumably make the abortion circumstance somewhat unique. Similarly grave consequences would not seem to flow, however, from a

denial of the child's apparent wishes in the instant case. To the contrary, the most severe and deleterious consequences could flow from *granting* Harald the rights that he seeks here.

The companion cases of *Parham v. J. R.,* 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979), and *Secretary of Public Welfare v. Institutionalized Juveniles,* 442 U.S. 640, 99 S.Ct. 2523, 61 L.Ed.2d 142 (1979), provide additional insights into the delicate balancing of constitutional interests when the wishes of parents and children collide. Both cases involve the question of what process is due when parents seek state institutional mental health care for one of their children. The Court ruled that a formal adversarial pre-admission hearing was not necessary and that the state could rely on the parents' decision to commit a child to a mental institution as long as a "neutral factfinder," *i. e.,* the admitting physician, still determines whether the statutory requirements for admission are satisfied. *Parham,* 442 U.S. at 606, 99 S.Ct. at 2506. The Court acknowledged that some parents might attempt to "dump" an unwanted child in a mental home but refused to require a pre-admission hearing into the motivation of the parents because of the disruptive effect of such a hearing on the parent-child relationship. *Parham,* 442 U.S. at 610, 99 S.Ct. at 2508.

While each set of circumstances may obviously be very different from the others, it is clear that any constitutional rights that a young child may possess to override unpalatable parental decisions are (and in my view should be) very limited.[3] Institutionalization in a mental home involves a very serious deprivation of a child's liberty interest—yet, the Court was willing to "permit the parents to retain a substantial, if not the dominant, role in the decision . . . ." *Parham,* 442 U.S. at 604, 99 S.Ct. at 2505. To give Harald a veto power over his moth-

---

**3.** In circumstances where the parent is unfit or acts contrary to the best interests of the child, state intervention into the familial relationship on behalf of the child may be justified. *See Parham,* 442 U.S. at 624, 99 S.Ct. at 2515 (Stewart, J., concurring); *Id.* at 630–31, 99 S.Ct. at 2518–19 (Brennan, J., dissenting). Harald has made no such claim in the instant case, however, and it is in any event doubtful that such a claim would properly be brought in federal court. State laws provide redress for the problems created by unfit parents.

er's decision to live in Sweden would be to reverse the normal roles of parent and child in the family setting.

Though a child who is not yet fully mature in all respects may be able to make mature decisions concerning certain activities, the parent-child relationship cannot be separated by subject matter into component parts. Litigation over the child's capacity to make [one] decision may endanger that relationship. If disagreement between parent and child over a contested right has not already 'fractured the family structure,' the state has a legitimate interest in preserving the parental role in guiding the child in other decisions that he is not yet mature enough to make alone. The psychological costs of litigation may even justify recourse to arbitrary line drawing by age, sacrificing the interests of the unusually precocious child at an age at which the availability to his contemporaries of individualized inquiry would only serve as a forum for immature aggression.

*Developments in the Law—The Family*, 93 Harv.L.Rev. 1156, 1380 (1980) (footnotes omitted). A child of less than eleven is simply not capable of going it alone. If Harald is able to remain in the United States contrary to the wishes and decision of his custodial parent, who will assume responsibility for his care? I am reluctant to make a child *de facto* a ward of the state because of a disagreement over where the family will live.[4] The power that Harald seeks to exercise over his own life is simply inappropriate to a child of his limited age and maturity. For this reason I would decline to recognize any independent constitutional right that Harald, not yet eleven, might exercise to challenge the decision of his custodial parent as to where she and her son will live.

---

**4.** I am also reluctant to recognize the father as an alternative provider of care for Harald because this would condone his "kidnapping" of Harald in apparent violation of the Swedish custody decree. In any event, custody is for the state courts to determine.